# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRONTPOINT EUROPEAN FUND, L.P., and RICHARD DENNIS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>- against -<br><br>BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., DEUTSCHE BANK AG, LLOYDS BANKING GROUP PLC, THE ROYAL BANK OF SCOTLAND PLC, UBS AG, AND JOHN DOE NOS. 1-50,<br><br>Defendants. | Docket No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................1

JURISDICTION AND VENUE .............................................................11

SUBSTANTIVE ALLEGATIONS ........................................................35

I.   Overview ....................................................................................35

II.   Background.................................................................................42

III.   Defendants Agreed to Restrain Trade in, and Intentionally Manipulate the Prices of, Sterling LIBOR-Based Derivatives Through Multiple Means Including the Following ...........................................................50

    A.   Defendants Made False Sterling LIBOR Submissions to the BBA and the Sterling LIBOR Agreement Fixed and Set in the U.S. Non-Competitive and Manipulated Prices for Trillions of Dollars' Worth of Sterling LIBOR-Based Derivatives.....................................................50

    B.   Defendants Colluded with Inter-Dealer Brokers to Carry Out Their Rigging of Sterling LIBOR and the Prices of Sterling LIBOR-Based Derivatives...............................................................................59

    C.   Defendants' Persistent Manipulation of Sterling LIBOR Caused Sterling LIBOR and the Prices of Sterling LIBOR-Based Derivatives to Be Artificial Throughout the Entire Class Period...........................62

    D.   Defendants Made False Bids and Offers in the Sterling Money Market ...............................................................................66

    E.   Defendants Engaged in Sham Transactions at Times of Decreased Liquidity to Maximize the Impact of Their Manipulative Conduct ...70

    F.   Defendants Intentionally Re-Organized Their Sterling LIBOR-Based Derivatives Desks to Facilitate and Encourage Manipulative Conduct ...............................................................................72

IV.   Plaintiffs Transacted in Sterling LIBOR-Based Derivatives at Artificial Prices Proximately Caused by Defendants' Manipulative Conduct ..........77

    A.   Plaintiff Frontpoint...........................................................78

    A.   Plaintiff Dennis................................................................80

    B.   Plaintiffs Frontpoint & Dennis...........................................82

TRADE AND COMMERCE..................................................................83

i

CLASS ACTION ALLEGATIONS ......................................................................84

EQUITABLE TOLLING AND FRADULENT CONCEALMENT......................87

CLAIMS FOR RELIEF ...................................................................................89

FIRST CLAIM FOR RELIEF ........................................................................89

SECOND CLAIM FOR RELIEF ...................................................................92

THIRD CLAIM FOR RELIEF .......................................................................94

FOURTH CLAIM FOR RELIEF ...................................................................96

FIFTH CLAIM FOR RELIEF ........................................................................97

SIXTH CLAIM FOR RELIEF........................................................................98

SEVENTH CLAIM FOR RELIEF ...............................................................109

EIGHTH CLAIM FOR RELIEF ..................................................................111

NINTH CLAIM FOR RELIEF.....................................................................112

PRAYER FOR RELIEF ...............................................................................114

DEMAND FOR JURY TRIAL ....................................................................116

Plaintiffs Frontpoint European Fund L.P. ("Frontpoint"), and Richard Dennis, complain upon knowledge as to themselves and their acts and upon information and belief as to all other matters, against Defendants (defined in ¶¶ 38-86) as follows:

## INTRODUCTION

1.      This action arises from Defendants' unlawful combination, agreement, and conspiracy to fix and restrain trade in, and their intentional manipulation of, the Sterling London Interbank Offered Rate ("Sterling LIBOR") and the prices of Sterling LIBOR-based derivatives during the period of at least January 1, 2005 through at least December 31, 2010 ("Class Period").

2.      Defendants' repeated manipulations of Sterling LIBOR violated the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.* ("CEA"), the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*, the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 – 1968 ("RICO"), and common law.

3.      Trillions of dollars of Sterling LIBOR-based derivatives were sold in the United States by Defendants and others during the Class Period.  A derivative is simply a contract among two or more parties in which the price or payment term is derived from another source.  Here, the prices and/or payments under the Sterling LIBOR-based derivatives purchased by Plaintiffs and Class members were

1

determined or directly affected by Defendants' daily agreement to fix Sterling LIBOR.

4.      Plaintiffs and the members of the Class (defined in ¶ 95) were injured in that they transacted in Sterling LIBOR-based derivatives at the artificial, non-competitive, and manipulated prices proximately caused by Defendants' foregoing violations of law.

5.      The United States Department of Justice ("DOJ"), the Commodity Futures Trading Commission ("CFTC"), and other governmental bodies have brought multiple charges against Defendants.  In the resulting non-prosecution agreements, deferred prosecution agreements, or other settlements, all but one of the Manipulator Defendants (as defined in ¶ 11) expressly admitted they manipulated Sterling LIBOR.  The non-prosecution agreement for the remaining Defendant indicates that such Defendant manipulated Sterling LIBOR.

6.      "Sterling LIBOR" is a financial innovation created by Defendants and their trade organization, the British Bankers' Association ("BBA").  Sterling LIBOR was represented to be the average competitive interest rate at which leading banks could borrow in pound sterling (that is, the British pound currency) in London from other banks.

7.      Sterling LIBOR was calculated from the submissions of a select group of contributor banks (the "panel").  Defendants were contributing members of the

BBA's Sterling LIBOR panel during the Class Period.  Each day, the panel banks were supposed to submit to the BBA their competitive market borrowing rates. Sterling LIBOR was calculated based on such submissions by Defendants and other panel banks of their supposed competitive market borrowing rates.

8.      Pursuant to agreement among Defendants, the other panel banks, and the BBA (the "Sterling LIBOR Agreement"), an average borrowing rate was calculated from the submissions. The Sterling LIBOR Agreement thereby fixed and set Sterling LIBOR each day.  Defendants and the Sterling LIBOR Agreement then caused Sterling LIBOR as well as each bank's Sterling LIBOR submission for that day to be published throughout the United States by means of interstate wires. Such fixed Sterling LIBOR rates set and fixed the portion of the transaction prices and payments that occurred on that day for the trillions of dollars of Sterling LIBOR-based derivatives that were outstanding in the United States.

9.      However, the Sterling LIBOR Agreement and Defendants systematically fixed and set an artificial, non-competitive, and manipulated price rather than a competitive market average price.  Throughout the Class Period, Defendants knowingly, intentionally, and repeatedly employed multiple anticompetitive means to cause the price fixed by the Sterling LIBOR Agreement to be artificial and manipulated.  These means included:

(a) coordinating the submission of false Sterling LIBOR submissions to the BBA for the purpose of driving the published Sterling LIBOR

3

fix in an artificial direction and/or amount that was not reflective of Defendants' true inter-bank borrowing costs;

(b) sharing proprietary information regarding their Sterling LIBOR-based derivatives positions;

(c) making false and "spoof" bids and offers in the Sterling money market for the purpose of manipulating Sterling interest rates to artificial levels;

(d) engaging in sham transactions with co-conspirators for financial derivatives that were priced, benchmarked and/or settled based on Sterling LIBOR; and

(e) timing illegitimate trades in Sterling money market instruments during periods of reduced liquidity so as to maximize the manipulative impact of such trades on Sterling interest rates.

10.     Defendants' manipulation of Sterling LIBOR and the prices of Sterling LIBOR-based derivatives during the Class Period was intentional, persistent, and knowingly unlawful.  Defendants' common goal in implementing this scheme was simple – to generate illicit profits for themselves and their co-conspirators on their Sterling LIBOR-based derivatives positions.

11.     Defendants Barclays Bank plc ("Barclays"), Coöperatieve Centrale Raiffeisen-Boerenleebank B.A. ("Rabobank"), Deutsche Bank AG ("Deutsche Bank"), Lloyds Banking Group plc ("Lloyds"), The Royal Bank of Scotland plc ("RBS"), and UBS AG ("UBS") (collectively, the "Manipulator Defendants") have thus far agreed to historic settlements with government regulators, including the United States Commodity Futures Trading Commission ("CFTC"), United States Department of Justice ("DOJ"), and United Kingdom Financial Conduct Authority

4

("FCA")[1], collectively paying in excess of $7 billion in fines and penalties to resolve charges relating to the restraint of trade and manipulation of LIBOR, including Sterling LIBOR and the prices of Sterling LIBOR-based derivatives.

12.     As part of these settlements, Defendants admitted their manipulation of Sterling LIBOR and the prices of Sterling LIBOR-based derivatives, including, *inter alia*:

13.     **Deutsche Bank**.  As part of its deferred prosecution agreement with the DOJ, Deutsche Bank admitted to manipulating Sterling LIBOR and fixing the prices of Sterling LIBOR-based derivatives.  Beginning in approximately 2005 and continuing until at least 2010, Deutsche Bank's Sterling LIBOR submitters frequently made false Sterling LIBOR submissions that benefited Deutsche Bank's trading positions in derivative products priced based on Sterling LIBOR.[2]

14.     Deutsche Bank's manipulative conduct originated from within its Global Finance and Foreign Exchange ("GFFX") business unit, which consisted of two subdivisions (a) "Global Finance and FX Forwards" ("GFF"), and (b) Foreign Exchange ("FX").[3]  However, it was not confined to a small group of individual traders.  The FCA concluded that Deutsche Bank's manipulation of Sterling

---

[1] The FCA succeeded the Financial Services Authority in 2013.

[2] *See* DOJ Deferred Prosecution Agreement and Attachment A Statement of Facts with Deutsche Bank AG at 65-66, ¶¶ 96-97, *USA v. Deutsche Bank AG,* No. 15cr61, Dkt. No. 6 (D. Conn. Apr. 23, 2015) (hereinafter "Deutsche Bank DOJ Statement of Facts"); *see also In re Deutsche Bank AG, Deutsche Bank AG, New York Branch,* Consent Order Under New York Banking Law §§ 44 and 44-a (Apr. 23, 2015) (hereinafter "Deutsche Bank NYDFS Consent Order"), at ¶ 30, 34, 43, 57.

[3] *See* Deutsche Bank DOJ Statement of Facts at 8.

LIBOR "extended to a number of areas within GFFX London including the MMD [money market derivatives] desk, Pool Trading desk, and FX Forwards desk. It also extended to GFFX desks abroad including . . . [in] New York."[4] In total, the FCA identified at least 29 individuals involved in the manipulative conduct at Deutsche Bank, including managers, derivative traders, and submitters in London, Frankfurt, Tokyo, and New York.[5]

15. During this same time period, the CFTC also found that Deutsche Bank "engaged in systemic and pervasive misconduct directed at manipulating critical, international financial benchmark rates," including Sterling LIBOR and "routinely made false reports regarding Sterling LIBOR in attempts to manipulate Sterling LIBOR in order to benefit Deutsche Bank's trading positions."[6]

16. **UBS**. As part of its non-prosecution agreement with the DOJ, UBS admitted to manipulating Sterling LIBOR and fixing the prices of Sterling LIBOR-based derivatives.[7] From at least as early as November 2007 through approximately July 2009, UBS's Sterling LIBOR submitters frequently received and accommodated requests from UBS's Sterling derivatives traders to alter UBS's

---

[4] *See* FCA Final Notice to Deutsche Bank, Reference No. 150018, at 2 (hereinafter "Deutsche Bank FCA Notice");

[5] *Id.* at 12.

[6] *See* CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions against Deutsche Bank AG, CFTC Docket No. 15-20 (Apr. 23, 2015) at 32 (hereinafter "Deutsche Bank CFTC Order").

[7] *See* DOJ Non-Prosecution Agreement and Appendix A Statement of Facts with UBS AG (Dec. 18, 2012) (hereinafter "UBS DOJ Statement of Facts"), at 21-22; *see also* CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions against UBS AG and UBS Securities Japan Co., Ltd., CFTC Docket No. 13-09 (Dec. 19, 2012) (hereinafter "UBS CFTC Order"), at 2.

Sterling LIBOR submissions to financially benefit their Sterling LIBOR-based derivatives positions.[8]

17.     The CFTC uncovered at least ninety requests from UBS's Derivatives Traders to "adjust UBS's Sterling LIBOR submissions in a manner that would benefit their derivatives trading positions" between 2007 and 2009.[9]  "The focus of requests, as with other currencies, was greatest when the Derivatives Traders had significant fixings on their swaps positions" as UBS's traders manipulated Sterling LIBOR to fix the prices of those Sterling LIBOR-based derivatives for their financial benefit.[10]

18.     Understanding the impact that their manipulative conduct would have upon the prices of Sterling LIBOR-based derivatives, "UBS's Sterling Trader-Submitters regularly acknowledged and followed these requests" for false submissions.[11]  The FCA also found that "UBS's Trader-Submitters routinely took the positions of its interest rate derivatives traders . . . into account" when making Sterling LIBOR submissions, demonstrating the persistent nature of this manipulative scheme.[12]

19.     **Rabobank**. As part of its deferred prosecution agreement with the

---

[8] *See* UBS DOJ Statement of Facts at 31-33, ¶¶ 77-82.

[9] *See* UBS CFTC Order at 38.

[10] *Id*.

[11] *Id*.

[12] *See* FCA Final Notice to UBS AG (Dec. 19, 2012) at 2, ¶ 6 (hereinafter "UBS FCA Notice").

DOJ, Rabobank admitted to manipulating Sterling LIBOR and fixing the prices of Sterling LIBOR-based derivatives.[13]  From around November 2007 through February 2009, Rabobank's Sterling LIBOR submitters received and accommodated requests from Rabobank's Sterling swaps traders to make false Sterling LIBOR submissions that would manipulate and fix the prices of Sterling LIBOR-based derivatives for their financial benefit.[14]

20.   **Barclays**.  As part of its non-prosecution agreement with the DOJ, Barclays admitted to manipulating Sterling LIBOR and fixing the prices of Sterling LIBOR-based derivatives.  From at least 2005 through at least 2009, Barclays' Sterling LIBOR submitters made false Sterling LIBOR submissions to financially benefit Barclays' Sterling LIBOR-based derivatives positions.[15]  The CFTC found that during this time period, Barclays' interest rate swap traders located in New York and London regularly requested that Barclays' LIBOR submitters make false LIBOR submissions to manipulate the daily LIBOR fixing in multiple currencies, including Sterling LIBOR, to financially benefit their LIBOR-based derivatives

---

[13] *See* DOJ Deferred Prosecution Agreement and Attachment A Statement of Facts with Rabobank, *USA v. Cooperatieve Centrale Raffeisen-Boerenleenbank BA*, No. 3:13cr200, Dkt. No. 14  (D. Conn. Oct. 29, 2013) (hereinafter "Rabobank DOJ Statement of Facts"); *see also* Department of Justice, Press Release, dated October 29, 2013, *Rabobank Admits Wrongdoing in LIBOR Investigation, Agrees to Pay $325 Million Criminal Penalty*, (available at:  http://www.justice.gov/opa/pr/rabobank-admits-wrongdoing-libor-investigation-agrees-pay-325-million-criminal-penalty) (hereafter "Rabobank DOJ Press Release").

[14] *See id*. at 31-32, ¶¶ 67-68.

[15] *See* DOJ Non-Prosecution Agreement and Attachment A Statement of Facts with Barclays Bank PLC (June 26, 2012) at 5 (hereinafter "Barclays DOJ Statement of Facts").

positions.[16]  Barclays also coordinated Sterling LIBOR submissions with former Barclays' traders, now working for unknown co-conspirator banks, to manipulate Sterling LIBOR for their collective financial benefit.[17]

21.    **Lloyds**.  As part of its deferred prosecution agreement with the DOJ, Lloyds admitted to manipulating Sterling LIBOR and fixing the prices of Sterling LIBOR-based derivatives.  Between at least as early as 2006 and at least as late as July 2009, Lloyds' Sterling LIBOR submitters made false Sterling LIBOR submissions "intended to benefit trading positions, rather than rates that complied with the definition of LIBOR."  Lloyds further admitted that "[t]he submitters contributed these improper rates in order to benefit their own trading positions or the trading positions of others," including those of unidentified co-conspirators.[18]

22.    Lloyds admitted to conspiring with inter-dealer brokers, intermediaries in the financial markets who arrange transactions between market participants, to coordinate its Sterling LIBOR submissions with unidentified co-conspirators for their collective financial benefit.[19]  The FCA also identified

---

[16] *See* CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions against Barclays PLC, Barclays Bank PLC and Barclays Capital Inc., CFTC Docket No. 12-25 (June 27, 2012) at 3 (hereinafter "Barclays CFTC Order").

[17] *Id*.

[18] *See* DOJ Deferred Prosecution Agreement and Attachment A Statement of Facts with Lloyds (Jul. 28, 2014) at A-6, ¶ 14 (hereinafter "Lloyds DOJ Statement of Facts").

[19] *See* Lloyds DOJ Statement of Facts at A-10 (discussing request for false Sterling LIBOR submissions with unidentified Broker-1).

instances where Lloyds made Sterling LIBOR submissions based on other traders' requests, in addition to their own trading positions.[20]

23.    **RBS**.  RBS is the one Manipulator Defendant which was not expressly found to have manipulated Sterling LIBOR.  As part of its deferred prosecution agreement with the DOJ, RBS admitted to manipulating LIBOR for multiple other currencies.[21]  RBS's Sterling LIBOR-based derivative traders were found to have engaged in the bank's strategy to manipulate LIBOR for at least one other currency during the Class Period.  For example, the CFTC found that RBS's Sterling cash traders served as intermediaries between RBS and UBS to coordinate requests for manipulative Yen LIBOR submissions. [22]  Given the persistent and secretive nature of the Defendants' wrongdoing, Plaintiff believes that further evidentiary support for the claims alleged herein (including against RBS) will be unearthed after a reasonable opportunity for discovery.

24.    Moreover, the deferred prosecution agreement between RBS and the DOJ included manipulative transactions that were filed under seal and not made public.  Because RBS participated in manipulating the other LIBOR currencies and

---

[20] *See* FCA Final Notice to Lloyds Bank plc and Bank of Scotland plc (Jul. 28, 2014) at 11, ¶ 4.30 (hereinafter "Lloyds FCA Notice").

[21] *See* United States Department of Justice, Criminal Division, Fraud Section and Antitrust Division Deferred Prosecution Agreement and Attachment A statement of Facts with The Royal Bank of Scotland plc, *USA v. Royal Bank of Scotland*, No. 3:13cr74, Dkt No. 5 (D. Conn. Feb. 6, 2013) at 8 (admitting to manipulation of Yen-LIBOR and Swiss franc LIBOR).

[22] *See* Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions against The Royal Bank of Scotland plc and RBS Securities Japan Limited, CFTC Docket No. 13-14 (February 6, 2013) at 19, 21-23, 32 (hereinafter "RBS CFTC Order").

its Sterling LIBOR traders participated in the manipulation of other LIBOR currencies, Plaintiffs have good grounds to believe, and do allege, that RBS manipulated Sterling LIBOR as well.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a), and pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and § 22 of the Commodity Exchange Act, 7 U.S.C. § 25, in addition to § 1964 of RICO, 18 U.S.C. § 1964.

26.     Venue is proper in this District pursuant to, among other statutes, §§ 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, § 22 of the Commodity Exchange Act, 7 U.S.C. § 25, § 1965 of RICO, 18 U.S.C. § 1965, and 28 U.S.C. § 1391(b), (c), and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

27.     Each Defendant is subject to personal jurisdiction because it transacted business throughout the United States, including in this District, including by transacting in Sterling LIBOR-based derivatives that are priced, benchmarked, and/or settled based on Sterling LIBOR from within the United States.  Each Defendant is subject to enhanced supervision by the Board of

Governors of the Federal Reserve System. Defendants Barclays, Rabobank, Deutsche Bank, and RBS consented to the personal jurisdiction of the United States Courts by registering their New York branch or representative offices with the New York State Department of Financial Services ("NYSDFS"), under New York Banking Law §§ 200 and 200-b. In addition, Lloyds' subsidiary, Lloyds Bank plc, New York branch, has also consented to personal jurisdiction by registering with NYSDFS. Defendants RBS and UBS consented to personal jurisdiction in the United States by registering with the Connecticut Department of Banking under § 36a-428g of the Connecticut General Statutes.

28. UBS AG specifically consented to jurisdiction in this District by entering into swap transactions with Frontpoint, for example, on October 17, 2007, November 22, 2007, and November 29, 2007. These transactions were executed in accordance with an International Swaps and Derivatives Association, Inc. ("ISDA") Master Agreement agreed to by UBS AG and Frontpoint on May 1, 2007 ("May 2007 ISDA Agreement").[23] The May 2007 ISDA Agreement set out overarching terms for all swap transactions between UBS AG and Frontpoint.

---

[23] The ISDA Master Agreement is a standardized form agreement published by the International Swaps and Derivatives Association, Inc., that is used to provide certain legal and credit protection for parties who entered into over-the-counter or "OTC" derivatives, including swaps and forward rate agreements. There are two main versions which are still commonly used in the market: the 1992 ISDA Master Agreement (Multicurrency – Cross Border) and 2002 ISDA Master Agreement. The May 2007 ISDA Agreement between UBS AG and Frontpoint used the 1992 ISDA Master Agreement form. Both the 1992 and 2002 ISDA Master Agreements are split into 14 sections which outline the contractual relationship between the parties, including their choice of governing law (¶ 13(a)), and consent to jurisdiction and venue (¶ 13(b)).

Trade confirmations for the October 17, 2007, November 22, 2007, and November 29, 2007, swap transactions, which were sent by UBS AG to Frontpoint in Connecticut using U.S. wires, indicate that these trades are covered by the May 2007 ISDA Agreement.

29.     The May 2007 ISDA Agreement required UBS AG and Frontpoint to attach a Schedule specifying the law governing the agreement and consent to jurisdiction and venue based on their decision.  For example, the May 2007 ISDA Agreement states that if the parties select New York law as the governing law in the attached Schedule, then each party "irrevocably" submits to the "jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City."  Further, "each party irrevocably . . . waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party."

30.     UBS AG and Frontpoint chose New York law as the governing law in the Schedule attached to the May 2007 ISDA Agreement.  As a result, UBS AG and Frontpoint "irrevocably" submitted to the "jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of

13

Manhattan in New York City."  Additionally, "each party irrevocably . . . waives

any objection which it may have at any time to the laying of venue of any

Proceedings brought in any such court, waives any claim that such Proceedings

have been brought in an inconvenient forum and further waives the right to object,

with respect to such Proceedings, that such court does not have any jurisdiction

over such party."

  31. In addition to the May 2007 ISDA Master Agreement between UBS

AG and Frontpoint, Plaintiffs' investigation has uncovered numerous additional

examples of ISDA Master Agreements entered by Defendants and U.S.-based

counterparties during the Class Period that select New York as the governing law

and consent to jurisdiction in this District.  The Sterling LIBOR-based derivatives

that Defendants traded and manipulated during the Class Period would have been

covered by similar ISDA Master Agreements, which based on this preliminary

evidence, would also be governed by New York law and include a consent to

jurisdiction and venue in this District.  By negotiating and signing ISDA Master

Agreements governed by New York law and trading Sterling LIBOR-based

derivatives in accordance with the terms of these agreements, Defendants

purposefully availed themselves of jurisdiction in this District.  Plaintiffs believe

that further targeted discovery of Defendants ISDA Master Agreements, including

Schedules indicating the parties' choice of governing law and forum, will unequivocally support personal jurisdiction.

32.     Defendants, directly and indirectly, unilaterally and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, specifically through use of electronic messaging and other electronic means of communication transmitted by wire across interstate and international borders in connection with the unlawful acts and practices alleged in this Complaint.  For example, through their daily electronic transmission of false Sterling LIBOR submissions, Defendants themselves transmitted and caused Thomson Reuters (the BBA's agent who collected and calculated Sterling LIBOR during the Class Period) to electronically transmit a false Sterling LIBOR fix (as well as Defendants' own individual false Sterling LIBOR submissions) from within the United States to U.S. market participants who transacted in Sterling LIBOR-based derivatives.

33.     The U.S. courts have jurisdiction over the claims asserted in this Complaint pursuant to § 22 of the CEA, 7 U.S.C. § 25, §1 of the Sherman Antitrust Act, 15 U.S.C. § 1, §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), § 1964 of RICO, 18 U.S.C. § 1964, and 28 U.S.C. §§ 1331 and 1337, respectively. Additionally, Sterling LIBOR and Sterling LIBOR-based derivatives contracts are each a commodity that trades in U.S. interstate commerce.  Sterling LIBOR is a

"commodity" and is the "commodity underlying" Sterling LIBOR-based

derivatives contracts, as those terms are defined and used in Section 1a(9) and 22

of the CEA, 7 U.S.C. §§ 1a(9) and 25(a)(1)(D), respectively.  More specifically,

Sterling LIBOR is an "excluded commodity" as that term is defined in Section

1a(19), 7 U.S.C. §§ 1a(19) (formerly 7 U.S.C. §1a(13)).  In the CEA, the term

"'excluded commodity' means (i) an interest rate, exchange rate, currency,

security, security index, credit risk or measure, debt or equity instrument, index or

measure of inflation, or other macroeconomic index or measure . . . ."  Excluded

commodities are subject to all CFTC anti-manipulation rules.  This included

Section 9(a)(2), which criminalizes manipulation through the dissemination of

false market information.

      34.    Defendants' restraints of trade, intentional false reporting,

manipulation and agreements to fix the price of Sterling LIBOR and manipulation

of the prices of Sterling LIBOR-based derivatives had direct, substantial and

foreseeable effects in the United States, and on the Sterling LIBOR-based

derivatives Plaintiffs and members of the Class transacted in during the Class

Period.  Many Sterling LIBOR-based derivatives were traded in the United States

and by U.S. market participants during the Class Period. Defendants, as Sterling

LIBOR contributor banks and sophisticated market participants, knew that Sterling

LIBOR rates published and compiled by and on behalf of the BBA are

disseminated in the U.S.  Defendants further well knew that Sterling LIBOR rates were used in the United States to price, benchmark, and/or settle Sterling LIBOR-based derivatives purchased, sold, or owned here.  For these reasons, Defendants knew that making false Sterling LIBOR submissions to the BBA and taking each of the other types of manipulative steps alleged herein that distorted Sterling LIBOR away from its competitive prices, would, and did, have direct, substantial, and reasonably foreseeable effects in the United States.  These included the direct effect of manipulating to artificial levels the prices of Sterling LIBOR-based derivatives contracts transacted in the United States, including in this District.

35.     Defendants' manipulative conduct, as alleged herein, had a direct, substantial, and reasonably foreseeable effect on United States domestic commerce.  Such direct effects injured Plaintiffs and give rise to Plaintiffs' claims, within the meaning of the Foreign Trade Antitrust Improvements Act.

## PARTIES

36.     Plaintiff Frontpoint is a Delaware limited partnership with its principal place of business in Greenwich, Connecticut.  Frontpoint engaged in U.S.-based transactions for Sterling LIBOR based-derivatives, including Sterling LIBOR-based swaps, during the Class Period directly with Defendant UBS AG. These swap transactions were covered by an ISDA Master Agreement in which UBS AG expressly consented and waived objection to jurisdiction and venue in

17

this District.  *See* ¶¶ 28-30, *supra*.  As a direct and proximate result of Defendants'

manipulative conduct, Frontpoint was damaged and suffered legal injury on swap

contracts transacted during the Class Period.  *See* ¶¶ 182-85, 189-90, *infra*.

37.    Plaintiff Richard Dennis ("Dennis") is a natural person, who resides in

Florida.  Dennis engaged in U.S.-based transactions for Sterling LIBOR-based

derivatives, including hundreds of British pound futures contracts traded on the

Chicago Mercantile Exchange ("CME"), during the Class Period at artificial prices

proximately caused by Defendants' unlawful manipulation and restraint of trade as

alleged herein.  As a direct and proximate result of Defendants' manipulative

conduct, Dennis was damaged and suffered legal injury on CME British pound

futures contracts transacted during the Class Period.  *See* ¶¶ 186-190, *infra*.

## A. <u>BARCLAYS</u>

38.    Defendant Barclays Bank, PLC, is a United Kingdom public limited

company headquartered in London.  During the Class Period, Barclays was a

member of the BBA Sterling LIBOR panel.  It is wholly owned by Barclays, PLC,

and has offices in New York, New York.[24]

39.    Barclays operates a bank branch in New York State ("Barclays Bank

PLC, New York Branch"), located in this District at 745 Seventh Avenue, New

York, New York.  Barclays Bank, PLC, New York Branch is licensed, supervised,

---

[24] See Barclays CFTC Order at 5.

18

and regulated by the New York State Department of Financial Services ("NYDFS") to do business in this state since 1963.  Barclays maintains a very substantial presence in the United States as is alleged more particularly below. Barclays is a provisionally registered swap dealer with the CFTC.

40.     Barclays Bank, PLC, New York Branch is one of at least two material operating entities that conducts core business lines and/or critical operations for Barclays in the United States.  Barclays Bank, PLC, New York Branch's primary activities include deposit taking, lending, and management of Barclays' U.S. Dollar funding position.

41.     Barclays Bank, PLC, New York branch has more than 500 employees and total assets exceeding $36 billion. Barclays Bank, PLC, New York Branch acts as an agent of Barclays Bank, PLC in the United States and in this District.

42.     Another material operating entity, Defendant Barclays Capital Inc. ("BCI"), is incorporated in the State of Connecticut and headquartered in New York.  BCI is a wholly-owned subsidiary of Barclays PLC.  BCI is a registered securities broker-dealer and investment advisor with the U.S. Securities and Exchange Commission ("SEC"), Futures Commission Merchant, commodity pool operator, commodity trading advisor registered with the CFTC, and municipal advisor registered with the SEC and the Municipal Securities Rulemaking Board.

During the class period, BCI actively engaged in trading, including derivative trading, in LIBOR and Euribor-based currencies, from New York.

43.     Barclays' core business lines and/or critical operations in the United States are headquartered in New York.  Barclays' presence in New York and the United States is so great that Barclays has caused to be named after it the Barclays Center, which is located in Brooklyn, NY.

44.     Barclays manipulated Sterling LIBOR and fixed the prices of Sterling LIBOR-based derivatives from within this District during the Class Period. On June 27, 2012, the CFTC and DOJ collectively ordered Barclays to pay $360 million as a civil penalty to settle charges that it manipulated Euribor and LIBOR for several currencies, including Sterling LIBOR.  Regulators found that Barclays' LIBOR submitters frequently accepted requests from Barclays' traders in at least New York, London, and Tokyo to submit manipulated LIBOR rates that benefited Barclays trading positions.

45.     The Barclays' New York Swaps Desk traded extensive amounts of Sterling LIBOR Derivatives during the Class Period.  These included interest rate swaps that were expressly contractually priced, benchmarked, and/or settled based on Sterling LIBOR.  The CFTC explicitly found that Barclays manipulated Sterling LIBOR during the Class Period.[25]  For example, a Barclays trader in

---

[25] *See* Barclays CFTC Order at 8.

20

Singapore would and did send requests crossing U.S. wires for a false Sterling

LIBOR to Barclays traders located in this District.[26]

### B. Rabobank

46.     Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.

("Rabobank") is a financial services provider with offices worldwide and its main

headquarters in the Netherlands.  During the Class Period, Rabobank was a

member of the BBA Sterling LIBOR panel.  Rabobank maintained a substantial

presence in this District and the United States as is alleged more particularly

below.

47.     Rabobank operates a New York branch (Rabobank, New York

Branch) located in this District at 245 Park Avenue, 37th Floor, New York, NY

10167.  Rabobank is licensed, supervised, and regulated by NYDFS to do business

in this state.

48.     Rabobank New York Branch is one of the entities conducting business

on behalf of Rabobank in the United States.

49.     Rabobank manipulated and facilitated the manipulations of Sterling

LIBOR and fixed the prices of Sterling LIBOR-based derivatives from within this

District during the Class Period.  The CFTC found that during the Class Period,

Rabobank's profit-driven LIBOR manipulation scheme involved traders,

---

[26] *Id*. at 8 n.9.

managers, and at least one senior manager located in, *inter alia*, Rabobank's New York branch.[27]

### C. Deutsche Bank

50.     Defendant Deutsche Bank AG is a German financial services company headquartered in Frankfurt, Germany.  During the Class Period, Deutsche Bank was a member of the BBA Sterling LIBOR panel.  Deutsche Bank maintains a very substantial presence in the United States, as is more particularly alleged below.

51.     Deutsche Bank's U.S. Headquarters are located in New York. Deutsche Bank also operates a New York branch ("Deutsche Bank AG, New York Branch") located in this District at 60 Wall Street, New York, NY 10005. Deutsche Bank AG, New York Branch acts as an agent of Deutsche Bank AG in the United States and in this District.  It has been licensed, supervised, and regulated by the New York State Department of Financial Services to do business in this state since 1978.  It is a material operating entity of Deutsche Bank and conducts its business activities solely out of its offices in New York.  It has over 1,700 employees in New York and total assets exceeding $152 billion.

---

[27] *See* Rabobank CFTC Order at 3, 38.

52. Deutsche Bank AG, through its wholly owned subsidiary, Deutsche Bank Securities Inc., engages in a high volume of securities transactions, including clearing activities, currency transactions, interest rate derivatives, and swaps.

53. Deutsche Bank is also a provisionally registered swap dealer with the CFTC. Deutsche Bank manipulated Sterling LIBOR and the prices of Sterling LIBOR-based derivatives from within this District during the Class Period. On April 23, 2015, Deutsche Bank and Deutsche Bank AG, New York Branch paid a $600 million fine to the New York State Department of Financial Services. [28] Deutsche Bank expressly admitted that between 2005 and 2010, Deutsche Bank AG, New York Branch manipulated LIBOR for several currencies, including Sterling LIBOR.

54. Deutsche Bank's LIBOR submitters, including its Sterling LIBOR submitters, sat on Pool Trading desks trading both cash and derivatives trading products as part of the Global Finance and Foreign Exchange ("GFFX") Group. In addition to the Pool Trading desks, the GFFX Group also included Deutsche Bank's Money Market Derivatives desks, which traded derivatives trading products with short term maturities and also held Deutsche Bank's proprietary trading books. The Pool Trading and Money Market Derivatives desks both held cash and derivatives positions priced off of LIBOR, including Sterling LIBOR.

---

[28] *See* Deutsche Bank NYDFS Consent Order at 17.

55.     A regional manager in Deutsche Bank's Frankfurt and New York offices oversaw the Pool Trading and Money Market Derivatives desks.

56.     Deutsche Bank engaged in so-called "Monday Risk Calls," in which traders in New York, London, Tokyo, and Frankfurt discussed with a supervisor their trading positions and strategies in relation to LIBOR rates.  This supervisor issued specific directives promoting manipulation by LIBOR (including Sterling LIBOR) submitters, collusion, and other improper conduct relating to Sterling LIBOR and other LIBOR rates.

### D. Lloyds

57.     Defendant Lloyds Banking Group, plc is a United Kingdom public limited company headquartered in London.  During the Class Period, Lloyds was a member of the BBA Sterling LIBOR panel.

58.     Lloyds maintained a substantial presence in the U.S. as is more particularly alleged below.  Lloyds is a registered swap dealer with the CFTC. Lloyds also operates a New York branch ("Lloyds Bank, plc, New York Branch") located in this District at 1095 Avenue of the Americas, New York, NY 10036. Lloyds Bank, plc, New York Branch is licensed, supervised, and regulated by the NYDFS to do business in this state.

59.     Lloyds Bank, plc, New York Branch is one of the material entities in the United States that conducts core business lines and/or critical operations for

Lloyds and acts as an agent for Lloyds Bank in the United States and in this District.  Lloyds Bank, plc, New York Branch's primary activities include providing lending and deposit products to U.S. commercial banks and insured depository institutions, other financial institutions, corporate non-financial institutions, and government agencies.

60.     Lloyds is listed on the New York Stock Exchange.

61.     Lloyds borrows and loans money at interest rates tied to LIBOR, including Sterling LIBOR.  Further, Lloyds enters into derivatives transactions tied to LIBOR, including Sterling LIBOR.

62.     According to the DOJ, Lloyds engaged in Sterling LIBOR-based lending and derivatives transactions with counterparties located within the United States during the Class Period. [29]  Lloyds entered such transactions with asset management corporations, mortgage and loan corporations, insurance companies, banks, and other financial institutions. [30]  These types of institutions frequently purchase Sterling LIBOR Derivatives.

**E. RBS**

63.     Defendant The Royal Bank of Scotland plc is a British banking and financial services company headquartered in Edinburgh, Scotland, United Kingdom.  RBS operates in approximately forty countries and territories around

---

[29] *See* Lloyds DOJ Statement of Facts at A18.

[30] *Id*.

25

the world.  This includes a substantial presence in the United States as alleged more particularly below.

64.    RBS maintains a Foreign Representative Office, registered with the NYSDFS, in this District at 340 Madison Avenue, New York, New York.  RBS is a provisionally registered swap dealer with the CFTC.

65.    Royal Bank of Scotland plc, New York Branch, is located in New York and is regulated by NYDFS to do business in this state.

66.    RBS's U.S. headquarters are located in Connecticut.  RBS operates a Connecticut branch ("The Royal Bank of Scotland plc, Connecticut Branch"), located at 600 Washington Boulevard, Stamford, CT 06901.  The Royal Bank of Scotland plc, Connecticut Branch is licensed, supervised, and regulated by the Connecticut Department of Banking to do business in that state.

67.    RBS employs derivatives traders, who are responsible for trading a variety of financial instruments, such as interest rate swaps and forward rate agreements, priced, benchmarked or settled to LIBOR, including Sterling LIBOR. These traders are located throughout the world, including in New York.

68.    RBS conducted some derivatives trading activities from its Connecticut headquarters.

69.    During the Class Period, RBS transacted in Sterling LIBOR-based derivatives with counterparties located within the United States, including asset

management corporations, business corporations, insurance companies, universities, and non-profit organizations.[31]

70.     During the Class Period, Defendant RBS served as a BBA LIBOR Panel Bank for Sterling LIBOR.  RBS also served as a BBA LIBOR Panel Bank for USD LIBOR, EURIBOR, YEN LIBOR, and SWISS LIBOR.

71.     In the Deferred Prosecution Agreement entered into by Defendant RBS with the Department of Justice on February 5, 2013, RBS provided the DOJ with certain supplemental information regarding "additional benchmark rates" which RBS requested be kept under seal pending the result of further DOJ investigations:

> "Although not addressed in Attachment A, this Agreement also encompasses RBS's submissions for the additional benchmark rates listed in Attachment C, which is also incorporated into this Agreement. The rates listed in Attachment C are the focus of an ongoing investigation and, for that reason, Attachment C will be held in confidence by the parties to this Agreement, will not be included in the public filing of this document, and will not be made available to the public unless and until the Department of Justice, in its sole discretion, determines that such information can and should be disclosed."[32]

72.     Plaintiffs have good grounds to believe that these submissions, when disclosed, or discovery herein, will provide further evidence that RBS engaged in additional collusive and manipulative activities regarding Sterling LIBOR.

---

[31] *See* RBS DOJ Statement of Facts at 38.

[32] RBS Deferred Prosecution Agreement dated February 5, 2013, n.1.

73.     Indeed, at least two RBS Sterling LIBOR traders have been directly linked to manipulating of other IBORs.  The CFTC provided specific examples of an RBS Sterling LIBOR cash trader assisting a UBS Yen trader in manipulating three-month YEN LIBOR on November 3, 2008 and six-month Yen LIBOR on May 7, 2008. *See* CFTC Order Instituting Proceedings against RBS dated February 6, 2013, page 21.  If the RBS Sterling LIBOR traders would manipulate other currencies, they likely manipulated Sterling LIBOR as well.  *See id.* at 19, 22-23, 32.

74.     Moreover, RBS has also been found to have been actively manipulating all of the other principal LIBOR currencies: YEN LIBOR, SWISS FRANC LIBOR, and U.S. Dollar LIBOR (FSA Final Notice to RBS dated February 6, 2013, *passim* and page 2); YEN LIBOR, SWISS LIBOR and EURIBOR (CFTC Order Instituting Proceedings against RBS dated February 6, 2013, *passim* and page 4, n.4); and YEN LIBOR, SWISS LIBOR, US Dollar LIBOR and EURIBOR (Attachment A to Deferred Prosecution Agreement dated February 5, 2013 (Statement of Facts), *passim* and page 18 (trader transcript reference) and page 34, n.23).  Because RBS manipulated all the other currencies, and at least two of its Sterling LIBOR traders were manipulating other currencies, RBS likely manipulated Sterling LIBOR as well.

### F. **UBS**

75.     Defendant UBS AG is a Swiss banking and financial services company headquartered in Zurich and Basel, Switzerland.  UBS provides investment banking, asset management, and wealth management services for private, corporate and institutional clients worldwide.  It has operations in over 50 countries, including the United States where UBS maintains a very substantial presence.  During the Class Period, Defendant UBS served as a BBA LIBOR Panel Bank for Sterling LIBOR.

76.     UBS maintains branches and representative offices in several U.S. states, including Connecticut, Illinois, Florida, and New York.  The U.S. headquarters of UBS are located in New York and Stamford, Connecticut.  UBS's Stamford Branch ("UBS AG, Stamford Branch) is the primary booking center for UBS's foreign exchange business with U.S. clients and U.S. corporate lending business.  UBS AG, Stamford Branch also houses operations and support functions for other U.S. branches and subsidiaries.

77.     UBS is registered with the Office of the Comptroller of the Currency and the Connecticut Department of Banking.  UBS is licensed and supervised by the Board of Governors of the Federal Reserve System and is a provisionally registered swap dealer with the CFTC.

78.     During the Class Period, UBS's Rates Division and Short Term Interest Rate ("STIR") desk transacted in interest rate derivatives, such as interest rate swaps, whose value depended on LIBOR, including the Sterling LIBOR, through traders located in Connecticut.[33]

79.     Traders in UBS's Rates Division and STIR desk acted as submitters of LIBOR rates, including for Sterling LIBOR or made requests of LIBOR submitters to submit rates favorable to their trading positions.

80.     From 2007 through at least 2009, UBS traders responsible for making Sterling LIBOR submissions received at least ninety (90) requests from derivatives traders to manipulate Sterling LIBOR submissions to benefit derivatives trading positions.[34]  UBS often manipulated its Sterling LIBOR submissions to accommodate such requests.

81.     UBS derivatives traders would use electronic chatrooms and emails, in addition to other methods, to request the manipulation of Sterling LIBOR.

82.     Additionally, at least one senior UBS manager in its Stamford, Connecticut headquarters directly manipulated UBS's LIBOR submissions.  This manager directed UBS LIBOR submitters to similarly manipulate LIBOR submission across all currencies, including Sterling LIBOR.[35]

---

[33] *See* UBS CFTC Order at 8-9.

[34] *Id.* at 38.

[35] *Id.* at 48.

83.     John Doe Defendant No. 1 is the company referred to as "Broker 1" by the Lloyds CFTC Order and the Lloyds DOJ Statement of Facts in the Orders dated July 28, 2014.  John Doe No. 1 regularly combined, conspired, and agreed with Defendants, including Defendant Lloyds, to manipulate Sterling LIBOR. Certain of the communications and steps taken by Broker 1 with Defendants pursuant to such combination, conspiracy, or agreement are alleged hereinafter. Plaintiffs allege that John Doe No. 1 engaged in many more acts and communications with Defendants in order to manipulate Sterling LIBOR.

84.     John Doe Defendant No. 2 is the company referred to as "Broker 2" by the Lloyds DOJ Statement of Facts in the Order dated July 28, 2014.  John Doe No. 2 regularly combined, conspired, and agreed with Defendants, including Defendant Lloyds, to manipulate Sterling LIBOR.  Certain of the communications and steps taken by Broker 2 with Defendants pursuant to such combination, conspiracy, or agreement are alleged hereinafter.  Plaintiffs alleges that John Doe No. 2 engaged in many more acts and communications with Defendants in order to manipulate Sterling LIBOR.

85.     John Doe Defendant No. 3 is the company referred to as "Broker B" by the UBS DOJ Statement of Facts, and the Lloyds FCA Notice in the Orders dated Dec. 18, 2012 and Jul. 28, 2014, respectively.  John Doe No. 3 regularly combined, conspired and agreed with Defendants, including Defendant UBS and

Lloyds, to manipulate Sterling LIBOR.  Certain of the communications and steps taken by Broker B with Defendants pursuant to such combination, conspiracy, or agreement are alleged hereinafter.  Plaintiffs allege that John Doe No. 3 engaged in many more acts and communications with Defendants in order to manipulate Sterling LIBOR.

86.     John Doe Defendants Nos. 4-50 are other entities or persons, including banks, interdealer brokers, cash brokers, and other co-conspirators whose identities are currently unknown to Plaintiffs.  The John Doe Defendants participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of Sterling LIBOR and the prices of Sterling LIBOR-based derivatives.

87.     During the Class Period, each Defendant was a member of the BBA. The BBA was a trade association composed of horizontal competitor banks. The BBA was not a regulatory body and had no regulatory function; its activities were not overseen by any government agency.  Rather, as the BBA has acknowledged, it was the leading trade association for the United Kingdom banking and financial services sector.  The BBA advocated on behalf of its more than 200 member banks from 60 countries on a full range of U.K. and international banking issues.

88.     During the Class Period, this banking trade association was self-governed by a board of member banks that met four times each year.  The board at relevant times was composed of senior executives from twelve banks, including Defendants (or their affiliates) Barclays, Deutsche Bank, and RBS.

89.     **U.S.-Based Market Activity.**  According to the Federal Reserve Bank of New York, Defendants Barclays, UBS, RBS, and Deutsche Bank each engaged in over-the-counter interest rate derivatives transactions from within the United States throughout the Class Period.  Every three years, the Federal Reserve Bank of New York conducts a survey of the over-the-counter interest rate derivatives and foreign exchange market.[36]  This survey measures the "turnover," or volume of transactions, in over-the-counter interest rate and foreign exchange derivatives within the United States.

90.     The foregoing Federal Reserve Bank of New York survey **only** includes data from dealers located within the United States and transactions that are located within the United States.  Defendants Barclays, UBS, RBS, and Deutsche Bank each participated in the Federal Reserve Bank of New York's survey of foreign exchange and interest rate derivatives dealers throughout the Class Period.  This indicates that they entered into foreign exchange and interest

---

[36] For the latest survey, *see The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, April 2013*, FEDERAL RESERVE BANK OF NEW YORK (Sept. 5, 2013), http://www.newyorkfed.org/markets/pdf/2013triennialreport.pdf.

rate derivatives transactions, including those based on Sterling LIBOR, from within the United States.

91.    During the Class Period, the Sterling foreign exchange and interest rate derivatives market was the fourth largest interest rate derivatives market within the United States.[37]  More than $1.3 trillion in Sterling LIBOR-based derivatives were traded during April 2007 alone.[38]  In total, almost $100 trillion in Sterling LIBOR-based derivatives were traded over-the-counter within the United States during the Class Period.

92.    Defendants maintained extremely large and profitable operations in the U.S. during the Class Period, from which they transacted in a full range of interest rate derivative products, including those based upon Sterling LIBOR.  In the December 31, 2010 audited financial statements for Deutsche Bank Securities Inc. ("DBSI"), the wholly-owned U.S. subsidiary of Defendant Deutsche Bank, DBSI showed the fair value on its books of interest rate contracts, such as those denominated in Sterling LIBOR, as over $4.9 billion in assets and over $5 billion in liabilities (page 13).  The financial statements also showed that the interest rate contracts, including those denominated in Sterling LIBOR, were being carried with a gross basis value of $14.8 billion (before the effects of any enforceable netting

[37] *See The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, April 2007*, FEDERAL RESERVE BANK OF NEW YORK, Annex II (available at https://web.archive.org/web/20080515211300/http://www.newyorkfed.org/markets/triennial/fx_survey.pdf)
[38] *Id.*

agreements).  In a similar manner, Defendant Barclays, in its Form 20-F for the

fiscal year ended December 31, 2008 and filed March 24, 2009, showed that under

the category of "credit risk concentration by geographical sector," the on-balance

sheet derivative financial instruments exposure for the U.S., which would include

Sterling LIBOR instruments, was £366.161 billion (page 253).  The revenues

attributed to United States operations deriving from "external customers" totaled

£2.84 billion in £2006, £2.209 billion in 2007, and £710 million in 2008 (page

284).

## SUBSTANTIVE ALLEGATIONS

### I.   Overview

93.    Defendants were horizontal competitors in the United States, *i.e.,*

Defendants operated businesses that competed with one another at the same level

of distribution of financial services and products.

94.    Defendants competed against one another and others in the United

States in the sales of financial services and products, including sales of interest rate

swaps, forward rate agreements, foreign exchange forwards, and other financial

products in which the price or payments were based upon the Sterling LIBOR.

Defendants also competed with one another and others in transacting in the futures

35

markets.  This includes in three-month Sterling futures contracts traded on the

LIFFE,[39] and British pound futures contract traded on the CME[40].

95.     Through such competition, Defendants could provide to the markets

in Sterling LIBOR-based derivatives the benefits of competition, including

competitive prices.

96.     The Defendants and other of the horizontal competitor banks agreed

to create and continue the BBA.  They further agreed with the BBA to fix and

report Sterling LIBOR prices (rates) each day ("Sterling LIBOR Agreement").

97.     Pursuant to the Sterling LIBOR Agreement, each business day,

Defendants submitted their answer to the following questions: "At what rate could

you borrow funds, were you to do so by asking for and then accepting inter-bank

offers in a reasonable market size just prior to 11 a.m.?"  Each day, Thomson

Reuters collected the answers, published them, calculated the LIBOR benchmark

as the mean of the middle eight submissions, and published this mean as the

average Sterling LIBOR competitive market interest rate.

98.     Antitrust law has long recognized the dangers lurking in this kind of

group sharing and publication and use of price information, especially when done

through an unregulated trade group consisting of horizontal competitors.  *Am.*

---

[39] *See Three Month Sterling (Short Sterling) Future*, ICE, https://www.theice.com/products/37650330/THREE-MONTH-STERLING-SHORT-STERLING-FUTURE.

[40] *See British Pound Futures Contract Specs*, CME GROUP, http://www.cmegroup.com/trading/fx/g10/british-pound_contract_specifications.html.

*Column & Lumber Co. v. United States,* 257 U.S. 377 (1921); *compare Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J) (allegation that horizontal competitors agreed to share price information plausibly alleged a stand-alone agreement in unreasonable restraint of trade regardless of whether an agreement to fix prices followed). But such arrangements can serve legitimate purposes by improving transparency of the competitive market prices. Far more than in the foregoing situations, the Sterling LIBOR Agreement carried the risk of causing artificial rather than competitive market prices.

99.     In order to try to ensure that Sterling LIBOR constituted the average competitive market interest rate, the BBA purported to promulgate certain Instructions:

"A. **An individual** BBA LIBOR Contributor Panel Bank will contribute **the rate at which it** could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable **market** size just prior to 1100.

B.     Rates shall be contributed for currencies, maturities and fixing dates and according to agreed quotation conventions.

C.     **Contributor Banks shall input their rate without reference to rates contributed by other Contributor Banks.**

D.     Rates shall be for deposits:

made in the London **market** in **reasonable market** size;

that are simple and unsecured….

….

G.     …. The Designated Distributor will endeavor to identify and arrange for the correction of manifest errors in rates input by individual Contributor Banks prior to 1130.

**The Designated Distributor will publish the average rate and individual Contributor Banks' rates at or around 1130hrs London time.**

Remaining manifest errors may be corrected over the next 30 minutes. The Designated Distributor then will make any necessary adjustments to the average rate and publish it as the BBA LIBOR Fixing at 1200hrs."[41]

100.   The foregoing Instructions gave the appearance in at least three ways that Sterling LIBOR submissions constituted a competitive market rate and that the Sterling LIBOR mean was fixing a competitive average market rate.  First, each individual bank was supposed to make its own submission relating to the competitive market rate at which it could borrow funds.  *See* Instruction "A" above.  This borrowing rate was expressly limited to that for loans of "reasonable market size."  The "reasonable market size" requirement for each bank's estimate of borrowing costs most closely captured the competitive market borrowing rate.

101.   Second, each panel bank was supposedly prohibited from referring to, or coordinating with other panel banks, in the submissions that such panel bank made.  *See* Instruction "C" above.  This prohibition of information sharing was supposedly reinforced and further ensured by the Instruction "G" above.  Specifically, Instruction "G" mandated that there would be only a simultaneous release of all banks' rates.  Such simultaneous release prevented any coordination among the banks after receipt from the BBA of another bank's rate.  This forced each bank individually to submit its own competitive rate for borrowing.

---

[41] https://web.archive.org/web/20080930203457/http://www.bba.org.uk/bba/jsp/polopoly.jsp?d=225&a=1413&artpage=all (last viewed July 23, 2015) (emphasis added).

102.   Third, the Sterling LIBOR rate was supposedly applicable to deposits made in the "market" and, even then, only those which were of "reasonable market size."  *See* Instruction "D" above.  These requirements supposedly further ensured that a competitive "market" rate was reflected by Sterling LIBOR.  Instruction "D" prohibited the use, for example, as the basis for each bank's submission of any non-market borrowing rates.  It even prohibited market rates for irregular sizes.  Once again, these requirements most closely captured the competitive market rate.

103.   Taken together, the foregoing Instructions, supposedly, assured that Sterling LIBOR would accurately reflect the average competitive market borrowing rate.  Such Instructions supposedly prohibited each bank's Sterling LIBOR submission from reflecting any collusion, coordination, advance notice among the competing banks, or sharing (directly or through brokers) of their intended rate submissions.

104.   Similarly, the Instructions, when taken together, supposedly prohibited each individual bank from using its self-interest in profits on its derivatives positions as a substitute for its competitive borrowing rate in determining the rate submission the bank would make.

105.   On the contrary, the sole basis for the submission by each bank was supposedly limited to "the rate at which it could borrow funds…in reasonable market size just prior to 1100."  *See* Instruction "A" above.  Defendants, through

the BBA supposedly made this supposed requirement even more explicit during 2008 when they stated that the:

> "basis for a … bank's submissions …was to be the rate at which members of the bank's staff primarily responsible for management of the bank's cash, rather than the bank's derivatives trading book, believed that the bank could borrow unsecured inter-bank funds in the London money market. Further, according to the BBA, a Contributor Panel bank should not have contributed a rate based on the pricing of any derivative financial instrument. In other words, a Contributor Panel bank's LIBOR submissions should not have been influenced by its motive to maximize profit or minimize losses in derivatives transactions tied to LIBOR."[42]

106.   But the BBA, Defendants, and the other parties to the Sterling LIBOR Agreement wholly failed to comply with the supposed Instructions.

107.   If the supposed Sterling LIBOR Instructions had been followed and Sterling LIBOR was not manipulated, the Sterling LIBOR Agreement would have fixed and published prices that reflected the competitive market rates.  This would have provided the benefits of competition to the Sterling LIBOR-based derivatives by fixing and setting fair and competitive prices for such derivative instruments.

108.   But Defendants systematically made manipulated rate submissions and the Sterling LIBOR Agreement systematically fixed and published artificial, manipulated, and non-competitive prices.  The Sterling LIBOR Agreement thereby fixed and set artificial prices in the U.S. on trillions of dollars of Sterling LIBOR-

---

[42] Deutsche Bank Statement of Facts ¶7, "Attachment A" to the Deferred Prosecution Agreement between Deutsche Bank and the DOJ (April 23, 2015).

based derivatives that were dependent on such prices.  This harmed competition and Plaintiffs and the Class members in multiple ways:

a.  Each Manipulator Defendant's manipulated report ceased to reflect that Defendant's competitively determined borrowing rate.  It ceased to provide the benefits of competition from the convenient dissemination by the Sterling LIBOR Agreement of that bank's competitive borrowing rate.

b.  More important, the Sterling LIBOR Agreement ceased to fix and publish a competitive rate.  On the contrary, the Sterling LIBOR Agreement then fixed and published a manipulated and non-competitive rate that subjected the markets for Sterling LIBOR derivatives to artificial and distorted prices.

c.  Third, the Sterling LIBOR Agreement thereby fixed and set artificial and manipulated prices in the Sterling LIBOR-based derivatives.  This then caused money to change hands under the trillions of dollars of Sterling LIBOR-based derivatives outstanding in the U.S. based on artificial prices that misallocated resources rather than competitive prices, good quality of service, and efficiency.

d.  Fourth, when the Sterling LIBOR Agreement caused manipulated prices to be fixed and published, it caused on a large scale throughout

41

the U.S. the harms to competition from agreements that fixed and set artificial prices that the Sherman Antitrust Act seeks to prohibit and prevent.

109.    The harm to competition from the artificially fixed rate determined by the Sterling LIBOR Agreement imposed a substantial burden on U.S. commerce in the trillions of dollars of Sterling LIBOR-based derivatives sold in the United States during the Class Period.

110.    Given the mathematical and formulaic nature of the Sterling LIBOR and the Sterling LIBOR-based derivatives, the amount of injury to Plaintiffs and Class on each Sterling LIBOR-based derivative instrument may be mathematically ascertained and computed.

## II.    **Background**

111.    Sterling LIBOR is a benchmark interest rate that is intended to reflect the rate of interest at which banks offer to lend unsecured funds denominated in Pounds Sterling, the official currency of the United Kingdom, to other banks in the inter-bank money market.

112.    Sterling LIBOR is based on interest rate quotes submitted by a select group of 16 contributor panel banks.  Each trading day, the contributors are asked to submit the rate of interest at which they could borrow funds, if they were to do so, by asking for and then accepting inter-bank offers in a reasonable market size

just prior to 11:00 A.M. London time.  Panel banks submit quotes for 15 tenors,

ranging from overnight to twelve months, which reflect the duration of the loan.

113.   To calculate Sterling LIBOR, Thomson Reuters, as administrator of

the LIBOR fixing, ranks the contributor bank quotes for each tenor in order and

averages the middle 50%.  This average rate becomes the daily official Sterling

LIBOR for that particular tenor and is distributed electronically to the market,

including within the United States, through Thomson Reuters and Bloomberg

among other financial services platforms.

114.   Throughout the Class Period, Defendants were members of the BBA

Sterling LIBOR panel and contributed interest rate quotes that were used to

calculate Sterling LIBOR.

115.   Again, according to BBA Instructions in place during the Class

Period, both Sterling LIBOR and Defendants' Sterling LIBOR submissions were

supposed to be "based on offered inter-bank deposit rates,"[43] representing the cost

of borrowing unsecured funds in the Sterling market.[44]  Contributor banks were

supposedly not permitted to consider factors unrelated to their cost of borrowing,

---

[43] *See*, *e.g.*, *The BBA LIBOR Fixing and Definition*, BBA (last visited July 24, 2015)
https://web.archive.org/web/20080930203457/http://www.bba.org.uk/bba/jsp/polopoly.jsp?d=225&a=1413&artpage
=all.

[44] Deposit rates represent the cost of borrowing funds in the inter-bank market because one way banks borrow
money is by issuing certificates of deposit ("CDs").  A CD functions as a short term loan to the bank.  Money is
deposited for a certain period of time and is returned to the depositor with interest at maturity. *See* Timothy Q. Cook
and Robert K. Laroche, *Instruments of the Money Market*, FEDERAL RESERVE BANK OF RICHMOND, 2 (available at
https://www.richmondfed.org/publications/research/special_reports/instruments_of_the_money_market/).

*e.g.*, the value of their Sterling LIBOR-based derivatives positions.

116.   But by means of the Sterling LIBOR Agreement, the Defendants systematically made false Sterling LIBOR submissions to the BBA for the purpose of manipulating and fixing the prices of "Sterling LIBOR-based derivatives," financial instruments that are priced, benchmarked, and/or settled based on Sterling LIBOR, for their financial benefit.  For example, the CFTC found*, inter alia*, that:

(a) In 2006, Lloyds TSB and HBOS submitters on certain occasions increased their bids for Sterling in the cash market in an attempt to manipulate the published Sterling LIBOR fixing higher, thereby benefitting specific trading positions that were tied to Sterling LIBOR.  *See* Lloyds CFTC Order at 3;

(b) On numerous occasions, from at least 2007 through at least 2009, the Lloyds TSB Sterling LIBOR Submitter made false submissions and attempted to manipulate Sterling LIBOR in order to benefit his cash and derivatives trading positions. In a few instances, the Lloyds TSB Sterling LIBOR Submitter was successful in his attempts to manipulate Sterling LIBOR. *See* Lloyds CFTC Order at 3;

(c) During the period from at least mid-2005 through the fall of 2007, and sporadically thereafter into 2009, Barclays based its LIBOR submissions for U.S. Dollar (and at limited times other currencies, *e.g.*, Sterling) on the requests of Barclays' swaps traders, including former Barclays swaps traders, who were attempting to affect the official published LIBOR, in order to benefit Barclays' derivatives trading positions; those positions included swaps and futures trading positions.  *See* Barclays CFTC Order at 2-3;

(d)  Accordingly, Barclays regularly attempted to manipulate and knowingly delivered false, misleading or knowingly inaccurate reports concerning U.S. Dollar LIBOR, and at times, Yen and Sterling LIBOR, which are all commodities in interstate Commerce. *See* Barclays CFTC Order at 11;

(e) *First,* from at least January 2005 to at least June 2010, UBS made knowingly false submissions to rate-fixing panels to benefit its derivatives

trading positions or the derivatives trading positions of other banks in attempts to manipulate Yen, Swiss Franc, Sterling and Euro LIBOR and Euribor, and, periodically, Euroyen TIBOR. *See* UBS CFTC Order at 2;

(f) Deutsche Bank routinely based its U.S. Dollar, Yen, Sterling, and Swiss Franc LIBOR and Euribor submissions on its cash and derivatives trading positions, the profitability of which were tied to LIBOR and Euribor. Through its regular, false LIBOR and Euribor submissions, Deutsche Bank routinely attempted to manipulate LIBOR and Euribor in order to ensure that the published rates for each benchmark benefited its trading positions. *See* Deutsche Bank AG CFTC Order at 2;

(g) Rabobank derivatives and cash traders frequently asked Rabobank's LIBOR and Euribor submitters to submit preferential rates in attempts to manipulate U.S. Dollar and Yen LIBOR, Euribor, and, on occasion, Sterling LIBOR, to benefit Rabobank traders' cash and derivatives trading positions that were tied to these benchmark interest rates. Rabobank's submitters often accommodated those requests and made false submissions reflecting the requested rates as Rabobank's contributions to the fixings of LIBOR for several currencies and Euribor. *See* Rabobank CFTC Order at 2.

117.   There are many different types of Sterling LIBOR-based derivatives, including, *inter alia*, over-the-counter instruments, such as interest rate swaps, forward rate agreements, foreign exchange forwards, cross-currency swaps, overnight index swaps, tenor basis swaps,[45] as well as exchange-traded futures and options, such as the CME British pound futures contract[46] and three-month Sterling futures contracts traded on the LIFFE.[47]   As part of Defendant Rabobank's CFTC

---

[45] *See* Rabobank CFTC Order at 6 (explaining that these derivatives, including foreign exchange forwards, are "priced off of" Sterling LIBOR and were traded by Rabobank during the Class Period to generate profit).

[46] *See British Pound Futures Contract Specs*, CME Group, http://www.cmegroup.com/trading/fx/g10/british-pound_contract_specifications.html.

[47] *See Three Month Sterling (Short Sterling) Future*, ICE, https://www.theice.com/products/37650330/THREE-MONTH-STERLING-SHORT-STERLING-FUTURE.

settlement, the CFTC explained these derivatives are "priced off of" Sterling

LIBOR and were traded by Rabobank during the Class Period to generate profit.[48]

    (a) <u>Interest Rate Swap</u>.  An interest rate swap ("swap") is a financial

derivative instrument in which two parties, called counterparties, agree to

exchange interest rate cash flows. If, for example, a party has a

transaction in which it pays a fixed rate of interest but wishes to pay a

floating rate of interest tied to a reference rate, it can enter into an interest

rate swap to exchange its fixed rate obligation for a floating rate one. In

the example above, Party A would pay a fixed rate to Party B, while

Party B pays a floating interest rate to Party A indexed to a reference rate

like LIBOR or EURIBOR. In other words, Party B's interest payments to

Party A are variable and change based on the movements in LIBOR or

EURIBOR. There is no exchange of principal amounts, which are

commonly referred to as the "notional" amounts of the swap transactions.

Interest rate swaps are traded over-the-counter in that they are negotiated

in transactions between counterparties and are not traded on exchanges.[49]

    (b) <u>Forward Rate Agreement</u>.  Similar to an interest rate swap, a forward rate

agreement ("FRA") is an agreement between counterparties to exchange

---

[48] *See* Rabobank CFTC Order at 6.

[49] Statement of Facts, "Attachment A" to Deferred Prosecution Agreement between Deutsche Bank AG and the DOJ (April 23, 2015).

interest rate payments on a notional amount beginning at a future date and ending on some other future date. The interest rates are determined at the time of contracting. FRAs are commonly used to hedge future interest rate fluctuations. If, for example, a party wants to hedge against the risk of rising interest rates, that party can enter into a FRA at a fixed rate, guaranteeing the fixed rate at the future end date. Meanwhile, if a party desires to hedge against the risk of a decline in an interest rate, they may enter into a FRA at a floating rate, indexed to a reference rate like LIBOR or EURIBOR. FRAs are also utilized by speculators who in essence bet on future changes in interest rates. Like swaps, there is no exchange of notional amounts; instead, the only amount exchanged is the difference between the contracted interest rates.[50]

(c) <u>Currency Swap</u>.  A swap that involves the exchange of one currency (e.g., U.S. dollars) for another (e.g., Japanese yen) on a specified schedule.[51]

---

[50] Statement of Facts, "Attachment A" to Deferred Prosecution Agreement between Deutsche Bank AG and the DOJ dated April 23, 2015.

[51] CFTC Glossary, available at:
http://www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary/index.htm#F.  For example, suppose a U.S.-based company needs to acquire Swiss francs and a Swiss-based company needs to acquire U.S. dollars. These two companies could arrange to swap currencies by establishing an interest rate, an agreed upon amount and a common maturity date for the exchange. Currency swap maturities are negotiable for at least 10 years, making them a very flexible method of foreign exchange.

(d) <u>Cross Currency Swap</u>.  A pair of currencies traded in forex that does not include the U.S. dollar.  One foreign currency is traded for another without having to first exchange the currencies into American dollars.  Historically, an individual who wished to exchange a sum of money into a different currency would be required to first convert that money into U.S dollars, and then convert it into the desired currency; cross currencies help individuals and traders bypass this step. The US/GBP cross, for example, was invented to help individuals in the United States and England who wanted to convert their money directly without having to first convert it into another currency.

(e) <u>Foreign Exchange Forward</u>.  A transaction that solely involves the exchange of two different currencies on a specific future date at a fixed rate agreed upon on the inception of the contract covering the exchange.[52]

(f) <u>Basis Rate Swap</u>.  A type of swap in which two parties swap variable interest rates based on different money markets. This is usually done to limit interest-rate risk that a company faces as a result of having differing lending and borrowing rates. For example, a company lends money to individuals at a variable rate that is tied to the London Interbank Offered (LIBOR) rate but they borrow money based on the Treasury Bill rate.

---

[52] *See* 7 USC 1a(24); *see also* CFTC Glossary, available at:
http://www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary/index.htm#F.

This difference between the borrowing and lending rates (the spread) leads to interest-rate risk. By entering into a basis rate swap, where they exchange the T-Bill rate for the LIBOR rate, they eliminate this interest-rate risk.

(g) The price of the LIFFE three-month Sterling futures contracts is equal to 100 minus three-month Sterling LIBOR.[53]

118.   Each Sterling LIBOR-based derivative is priced based on, benchmarked and/or settled using a pricing formula that incorporates Sterling LIBOR.  Thus, as Sterling LIBOR changes, so does the value of all Sterling LIBOR-based derivatives.

119.   Defendants, as sophisticated Sterling LIBOR-based derivative market participants, each well understood this direct pricing relationship.  Each Defendant intentionally exploited such relationship for their financial benefit throughout the Class Period, which manipulated Sterling LIBOR and fixed the prices of Sterling LIBOR-based derivatives at artificial levels.

120.   Defendants' manipulative and collusive conduct, directly or through their subsidiaries or affiliates controlled by them or otherwise acting as their agents within their corporate families, engaged in manipulation of Sterling LIBOR and for-profit trading of Sterling LIBOR–based derivatives that were benchmarked,

---

[53] *See* https://www.theice.com/products/37650330/THREE-MONTH-STERLING-SHORT-STERLING-FUTURE (displaying pricing formula).

traded or price settled to Sterling LIBOR during the Class Period, as further alleged below, which directly impacted the trillions of dollars in Sterling LIBOR-based derivatives contracts that traded within the United States during the Class Period.

### III.   Defendants Agreed to Restrain Trade in, and Intentionally Manipulate the Prices of, Sterling LIBOR-Based Derivatives Through Multiple Means Including the Following

121.   To date, Defendants have entered into settlement agreements with multiple global regulatory agencies, including the DOJ, CFTC, and FCA, regarding their intentional manipulation of Sterling LIBOR and the prices of Sterling LIBOR-based derivatives.  While these settlement agreements provide only a snapshot of select instances of Defendants' manipulative conduct, they demonstrate how Defendants coordinated their Sterling LIBOR submissions and manipulative trading practices to fix the prices of Sterling LIBOR-based derivatives for their financial benefit.

### A. Defendants Made False Sterling LIBOR Submissions to the BBA and the Sterling LIBOR Agreement Fixed and Set in the U.S. Non-Competitive and Manipulated Prices for Trillions of Dollars' Worth of Sterling LIBOR-Based Derivatives

122.   During the Class Period, Defendants' derivatives traders frequently used electronic communications, including instant messages and chat rooms, to share information regarding their Sterling LIBOR-based derivatives positions and

to request Sterling LIBOR submissions that would manipulate and fix the prices of those derivatives at artificial levels for their financial benefit.

123.   These electronic chats occurred both internally (among Sterling LIBOR-based derivatives traders and Sterling LIBOR submitters within the same bank) as well as externally (among Sterling LIBOR-based derivatives traders and submitters located at different, supposedly competing, Sterling LIBOR contributor banks).  This included through electronic messages relayed between Defendants by various unidentified inter-dealer brokers.[54]

124.   For example, the CFTC found that "[f]rom at least November 2007 through at least September 2009, UBS's Sterling Derivatives Traders responsible for Sterling LIBOR submissions received at least ninety requests from Derivatives Traders to adjust UBS's Sterling LIBOR submissions in a manner that would benefit their derivatives trading positions."[55]

125.   The conversation below is one example where a UBS Sterling LIBOR-based derivatives trader requests a false higher Sterling LIBOR submission to financially benefit his Sterling LIBOR-based derivatives positions:

---

[54] As alleged in Part IIB *infra*, Lloyds admitted to conspiring with at least two different inter-dealer brokers to manipulate Sterling LIBOR and the prices of Sterling LIBOR-based derivatives during the Class Period.  *See* Lloyds DOJ Statement of Facts at A9-A10 (identifying two separate instances of collusion with "Broker 1" and "another" unidentified inter-dealer broker).

[55] *See* UBS CFTC Order at 38.

**May 27, 2009**:

UBS Sterling LIBOR-Based Derivatives Trader: need these libors to move higher

UBS Sterling LIBOR Submitter: market is calling 6m [for the Sterling LIBOR six month tenor] fix today at 1.485 . . . . I will fix it at 1.505.[56]

126.   On May 27, 2009, consistent with the UBS Sterling LIBOR-Based Derivative Traders' request, UBS's six-month Sterling LIBOR submission was 1.505%, artificially higher than the 1.485% reflected in the inter-bank money market.[57]  UBS's false May 27, 2009 Sterling LIBOR submission caused Sterling LIBOR to be artificial and fixed the prices of Sterling LIBOR-based derivatives at artificial levels.

127.   This kind of manipulative conduct occurred frequently during the Class Period.  In fact, the same UBS trader and submitter identified in ¶ 125 manipulated Sterling LIBOR the very next day.  This time, UBS's Sterling LIBOR Submitter initiated the conversation, reaching out to UBS's Sterling LIBOR-Based Derivatives Trader:

**May 28, 2009**:

UBS Sterling LIBOR Submitter: any special libor fixings today?

UBS Sterling LIBOR-Based Derivatives Trader: I would like to see fixings drift higher again . . . yesterday's came in good."

---

[56] UBS DOJ Statement of Facts at 31-32, ¶ 78.

[57] *Id.*

UBS Sterling LIBOR Submitter:  ok fix 6m [the rate for the Sterling LIBOR 6 month tenor] at 1.51[58]

128.   As promised, UBS's six-month Sterling LIBOR submission on May 28, 2008 was 1.51%,[59] artificially higher than reflected in the inter-bank money market.  UBS's false May 28, 2009 Sterling LIBOR submission also caused Sterling LIBOR to be artificial and fixed the prices of Sterling LIBOR-based derivatives at artificial levels.

129.   UBS's false Sterling LIBOR submissions, and in fact those of all Defendants, were intended to financially benefit their Sterling LIBOR-based derivative positions and were unrelated to any legitimate money market transactions.  Below is another example of an electronic chat, which the DOJ describes as "typical" during the Class Period, where UBS's Sterling LIBOR submitter disregards the actual offered rate of deposit in the market.  Instead, UBS makes a manipulated and false Sterling LIBOR submission for UBS's financial benefit:

**June 17, 2009:**

UBS Sterling LIBOR Submitter: Hi [high] libor fixings today?

UBS Sterling LIBOR-Based Derivatives Trader: hmm . . I'm hoping to see a high 3m [three month tenor] fix

---

[58] UBS DOJ Statement of Facts at 32, ¶ 79.

[59] *Id*.

UBS Sterling LIBOR Submitter: ok will fix at 26.5 but market expects 25[60]

130.   UBS's Sterling LIBOR submitter did, in fact, follow through in accommodating the trader's request and UBS's June 17, 2009 Sterling LIBOR submission was 1.265%.[61]  UBS's false June 17, 2009 Sterling LIBOR submission caused Sterling LIBOR to be artificial and fixed the prices of Sterling LIBOR-based derivatives at artificial levels.

131.   This conduct was not limited to UBS.  Other Defendants routinely manipulated Sterling LIBOR by making false submissions that would (and did) financially benefit their Sterling LIBOR-based derivative positions.  Below is a conversation between a Deutsche Bank Sterling LIBOR submitter and Deutsche Bank Sterling Desk Manager planning to manipulate Sterling LIBOR:

**August 1, 2008:**

Deutsche Bank Sterling LIBOR Submitter: Um, **we've got the two fixings up today, we need a high LIBOR in the ones. [one month tenor] Got a yard**[62]…

Deutsche Bank Sterling Desk Manager: Yeah

Deutsche Bank Sterling LIBOR Submitter: . . . **going out so we need high uh high LIBOR in the ones [one month tenor] and we'd need a low screen on the threes.**  I've got it at forty base points the LIBOR's coming in at like seventy-eight and I've I've moved our screen to like thirty-eight so I've got to modify that ticket at eleven yeah?[63]

---

[60] UBS DOJ Statement of Facts at 32-33, ¶ 82.

[61] *Id.*

[62] The term "yard" is commonly used among traders to refer to a notional value of $1 billion, *i.e.*, a trader who has 5 yards hold a position with a notional value of $5 billion.

[63] Deutsche Bank CFTC Order at 31 (emphasis in original).

132.   Likewise, the following short email exchange between a Rabobank Senior Sterling trader and Rabobank's Sterling Desk Manager demonstrates the ease and matter-of-fact way in which the Defendants manipulated Sterling LIBOR during the Class Period:

**<u>November 30, 2007</u>**:

<u>Rabobank Senior Sterling Trader Submitter</u>: (email to desk manager)

Subject: Libors

Need high 3s wnd low 1s [a high 3 month Sterling LIBOR rate submission, and a low 1 month Sterling LIBOR rate submission]

<u>Rabobank Sterling Desk Manager</u>: (email responding to senior trader submitter)

Subject: RE: Libors

Okokthe strate

<u>Rabobank Senior Sterling Trader Submitter</u>: (email responding to desk manager)

Subject: RE: Libors

See [Sterling Trader Submitter 3] has to put up with my nagging usually…He is worth his weight in gold[64]

133.   "Worth his weight in gold" and "put up with my nagging" describe the habitual nature of Defendants' manipulative activities, where Rabobank and the other Defendants frequently, routinely, and consistently made false Sterling

---

[64] Rabobank CFTC Order at 36.

LIBOR submissions during the Class Period.  Defendants' submissions were frequently not based on any legitimate money market transactions and were made solely to benefit the Defendants' trading positions.  This manipulative conduct rendered Sterling LIBOR and the prices of Sterling LIBOR-based derivatives artificial during the Class Period, causing legal injury to Plaintiffs and the Class, who were forced to transact at artificial prices proximately caused by Defendants' manipulative conduct.

134.   Rabobank knew that its manipulation of Sterling LIBOR and the prices of Sterling LIBOR-based derivatives would injure U.S. market participants, including Class members located in New York.  On November 5, 2015, Anthony Allen, Rabobank's Global Head of Liquidity and Finance, and Anthony Conti, a senior trader and back up Yen-LIBOR submitter, were found guilty of fifteen counts of wire fraud and conspiracy to commit wire fraud and bank fraud, following a trial in this District, for manipulating LIBOR.

135.   Allen's trial testimony demonstrates that he and others at Rabobank knew that Rabobank's manipulative conduct would affect prices in the United States and, acting with that knowledge, that Rabobank expressly aimed its misconduct at the U.S. market, including at those who transacted in interest rate swaps that were priced, benchmarked, and/or settled based on U.S. Dollar LIBOR, Yen-LIBOR, and "other currencies," *e.g.*, Sterling LIBOR:

Q. And you understood that the interest rate swaps involved yen LIBOR, US dollar LIBOR?

A. ***Amongst other currencies, yes***.

Q. And there are counterparties on the other side of these Rabobank interest rate swaps?

A. Yes.

Q. Located all over the world?

A. Yes.

Q. Located here in the US?

A. Yes.

Q. Located here in New York?

A. Yes.

. . . .

Q. And you understood that if the individual on one side of an interest rate swap was manipulating LIBOR, the other side would lose money?

A. Yes.[65]

136.    Testimony from Rabobank Yen-LIBOR submitter, Paul Robson, further shows that traders and submitters frequently conspired to manipulate LIBOR with employees located at Rabobank's New York branch, including Christian Schluep,[66] who traded "across a broad range of durations, currencies and products including swaps, FRAs, basis swaps (single ccy [currency] and X-ccy

---

[65] *United States v. Allen*, No. 14-cf-272, Transcript of Trial at 1265-1266.

[66] *Id*. at 404.

[cross-currency], bonds, repo, futures, FX and FX-forwards." [67]  Schluep made

multiple requests for false LIBOR submissions to financially benefit his

derivatives positons while working at Rabobank's New York office from April

2006 until at least October 2008.[68]

137.   Indeed, the Allen and Conti trial established that LIBORs for several

currencies, including Sterling LIBOR, were routinely manipulated, and that, in

fact, Rabobank had a well-established practice of manipulating Sterling LIBOR:

> [A] … Over the course of time, I started receiving these
> requests from these people, and I presented these to Mr. Allen
> on a number of occasions saying, "Are you OK with this?" or
> "I'm being asked to do this" …  And he was fine with that.
>
> Q.  …  Did you observe anything that would trigger you asking
> Mr. Allen these sort of questions?
>
> A.  Well, it was kind of rhetorical anyway *this practice had
> already been established on the dollar and sterling desks*.
> . . . .
>
> Q.  You said there was already a practice established.  Can you
> describe what you saw and what you heard in connection to
> what you perceived as a practice?
>
> A.  So, 11:15 was the published time of LIBOR, and I think
> 11:00 was kind of the cutoff time that all the banks had to
> transmit their numbers to the BBA by Reuters.  So approaching
> 11:00, the shout would go up on the desk "right LIBOR time" or
> "right guys, time for LIBORs" or ["]what are we going for the
> LIBORs today" at which point all of the interested parties would

---

[67] Christian Schleup, LINKEDIN, https://uk.linkedin.com/in/christianschluep (last visited Jan. 20, 2016).

[68] *See, e.g.,* United *States v. Allen*, No. 14-cf-272, Transcript of Trial at 236, 239, 242.

gather and discuss their positions, what they needed, and what was going to be set in the various tenors to suit the positions.[69]

138.   Further testimony revealed that Rabobank made false LIBOR submissions that were "sought from brokers in the market and also biased ... at the request of traders," demonstrating that Rabobank conspired with others when engaging in manipulative conduct.[70]

## B. Defendants Colluded with Inter-Dealer Brokers to Carry Out Their Rigging of Sterling LIBOR and the Prices of Sterling LIBOR-Based Derivatives

139.   Defendants coordinated their Sterling LIBOR submissions with other currently unknown Sterling LIBOR panel banks by using "inter-dealer brokers," *i.e.*, intermediaries that facilitate transactions between dealer banks in markets where there are no centralized exchanges, such as the over-the-counter market for Sterling LIBOR-based derivatives.

140.   Inter-dealer brokers communicate with multiple market participants, including the Defendants, every day.  Given their natural positions as intermediaries, Defendants used inter-dealer brokers to send requests for false Sterling LIBOR submissions to other currently unknown Sterling LIBOR contributor panel banks, coordinating their activity and maximizing the impact of Defendants' manipulative scheme.

---

[69] *United States v. Allen*, No. 14-cf-272, Transcript of Trial at 323-324.

[70] *Id.*, Transcript of Trial at 322; *see also* Rabobank DOJ Press Release.

141.   For example, below is a conversation between Lloyds' Sterling

LIBOR submitter and unidentified Broker 1.  During this conversation, Broker 1

(whose identity is currently unknown to Plaintiffs) advises Lloyds' Sterling

LIBOR submitter on how to maximize the impact of his false Sterling LIBOR

submission:

> **August 17, 2007**:
>
> Broker 1: I was just thinking, if um, if you went 75 for 3s LIBOR you might get take out of the um, the 8 [submissions used to calculate the fix]. Whereas if you go 70 you'll still be include in the 8 [submissions used to calculate the fix] and you'll get the higher fixing. It seems odd, but that's what I reckon.
>
> Lloyds Submitter-3: I've got no fixings today.  So I can do my LIBORs wherever I fucking want to put them, mate."[71]

142.   In addition to Broker 1, Lloyds admitted that its Sterling LIBOR

submitters coordinated their manipulative conduct with at least two different inter-

dealer brokers (whose identities are currently unknown to Plaintiffs).  Lloyds sent

the following message to a different unidentified "Broker 2," explaining the reason

behind an artificially higher Sterling LIBOR submission:

> **October 5, 2007**:
>
> Lloyds Submitter-3: (message to Broker 2) I put mine higher because I have a little bit of fixing here and there[72]

---

[71] Lloyds DOJ Statement of Facts at A10.

[72] *Id*.

143.   While the above referenced communications from Lloyds demonstrate that Defendants used inter-dealer brokers to coordinate their manipulation of Sterling LIBOR, they are likely just the tip of the iceberg.  Defendants used inter-dealer brokers to coordinate their manipulation of LIBOR and the prices of LIBOR-based derivatives across multiple currencies during the Class Period.  For example, the communications below are taken from UBS's non-prosecution agreement with the DOJ:

**February 25, 2009**:

**In an electronic chat with Trader 1. . .**

Trader 1: low 1m and 3m [one month and the three month] . . . we must keep 3m down . . . try for low on all of em

Broker B: ok ill do my best for those today

**Later that day on a recorded phone call with Bank F. . .**

Broker B: Can I ask you're a small favor?

Submitter F: Yeah

Broker B: Where are you going to set your Libor threes today?

Submitter F: Uh, same, .65.

Broker B: Is there any way you might be able to take it down [one basis point] cause I'm    getting a big trade out of it? . . . I'm getting someone to do me a big trade if they said I  can help 'em sort of get Libors down a bit today

<u>Submitter F</u>: Yeah, okay.[73]

144.   The UBS example above is instructive as to how the same Defendants in this case used inter-dealer brokers to coordinate their manipulative conduct. Given that Defendants used inter-deal brokers as a common tactic to manipulate LIBOR for multiple currencies during the Class Period, Plaintiffs believe that additional evidence of broker collusion regarding the manipulation of Sterling LIBOR, including the identities of Broker 1 and Broker 2 above, will be revealed given a reasonable opportunity for discovery.

### C. Defendants' Persistent Manipulation of Sterling LIBOR Caused Sterling LIBOR and the Prices of Sterling LIBOR-Based Derivatives to Be Artificial Throughout the Entire Class Period

145.   Even in the limited sub-set of Defendants' communications released to date, the persistent nature of their manipulative scheme is clear.

146.   For example, on September 27, 2007, a UBS manager inquired via email to UBS's Asset and Liability Management group ("ALM"), which was responsible for making LIBOR submissions, as to why UBS's Sterling LIBOR submissions were particularly high that day.  ALM responded that it had just issued a "big forward," *i.e.*, a Sterling LIBOR-based derivative that settles based on where Sterling LIBOR fixes on a particular day.  ALM explained that they were

---

[73] UBS DOJ Statement of Facts at 21-22.

"**trying to keep the fixing high** to increase the first interest payment on that fixing."[74]

147.   The foregoing conversation indicates a planned manipulation for more than two-months in advance of the next IMM fixing.  This is because quarterly International Monetary Market, or "IMM" Dates, occur on the third Wednesday of March, June, September and December of every year.  The September 2007 IMM Date occurred on September 17, 2007, before the message in ¶ 146 was sent.  This means that the next fixing was in December.

148.   In the conversation below, a Lloyds Sterling LIBOR submitter describes his price-fixing ritual whereby he *always* makes false Sterling LIBOR submissions in preparation for end of the month fixings:

<u>**March 31, 2009**</u>:

Former HBOS Sterling Submitter: […] I was just going to say, I am receiving on 3s [three month] LIBOR today on a couple on – on a bid reset on about 2 and a half yards [$2.5 billion notional amount of instruments] and I am receiving tomorrow on 5 yards, so on the LIBOR front obviously I don't know if you have got anything contrary to that, but if you haven't the firmer the better please.

Lloyds TSB[75] Sterling Submitter: The higher the better.

Former HBOS Sterling Submitter: Yes please.

---

[74] *Id*. at 32 (emphasis added).

[75] Defendant Lloyds was formerly known as Lloyds TSB.  After acquiring U.K. banking and insurance company HBOS plc, Lloyds TSB changed its name to Lloyds Banking Group plc in 2009.

<u>Lloyds TSB Sterling Submitter</u>: Oh mate, **I have always got loads of loans going out at the end of the month so I always try and fix it higher**[76]

149.    Throughout the Class Period, traders bragged about their ability to make money by consistently keeping Sterling LIBOR at artificial levels.  For example, in the message below, a Lloyds Sterling LIBOR Submitter brags to unidentified "Broker 1" about how his consistently higher Sterling LIBOR submissions were responsible for Lloyds financial success:

**<u>June 28, 2007</u>**:

<u>Lloyds TSB Sterling Submitter</u>: If I didn't have my LIBOR **slightly higher than I usually did**, we wouldn't even make—if I have my LIBORs where LIBORs are, in 1s [one month tenor], I wouldn't make anything[77]

150.    Sterling LIBOR-based derivative traders and Sterling LIBOR submitters also coordinated their false submissions weeks in advance, gradually manipulating Sterling LIBOR in a particular direction for their financial benefit. For example, Deutsche Bank's Sterling LIBOR submitter and a Sterling desk manager discuss their plan to manipulate Sterling LIBOR higher over the next few weeks in advance of the September 2010 IMM date:

**<u>August 31, 2010</u>**:

<u>Sterling LIBOR Submitter</u>: [Senior MMD Sterling Trader's] come over, he wants 3s [unintelligible] libor down a tick [unintelligible]

<u>Sterling Desk Manager</u>: No, no, no, no, no.

---

[76] Lloyds CFTC Order at 8-9.

[77] *Id*. at 7.

64

<u>Sterling LIBOR Submitter</u>: No, he's got a fixing, he said. I said we've got stuff about the 15th of September. We need higher libors, don't we.

<u>Sterling Desk Manager</u>: Yeah

<u>Sterling LIBOR Submitter</u>: But you need it, we need 3s to go to 76 and 77

<u>Sterling Desk Manager</u>: Yeah, I want it higher libor.[78]

151.   At other Defendant banks, management issued a standing order to manipulate Sterling LIBOR.  The CFTC found that UBS's management issued a company policy for its Sterling LIBOR submitters to solicit requests for submissions from UBS's Sterling LIBOR-based derivatives traders on a *daily* basis:

> Commencing in or around the summer of 2008 and continuing until September 2009, a member of UBS's STIR management also sought to ensure that derivatives trading positions were consistently being taken into account. Senior STIR Manager A instructed the Trader-Submitters who were based in Zurich to consult each morning with the UBS Sterling Derivatives Traders in London to determine their net risk with respect to the derivatives trading positions and to adjust UBS's Sterling LIBOR submissions accordingly to benefit those positions. The Trader-Submitters complied with the instruction and at that point **adjusted their Sterling LIBOR submissions each day** based on information obtained daily from the London-based traders about their net positions tied to Sterling.[79]

---

[78] Deutsche Bank CFTC Order at 32.

[79] UBS CFTC Order at 39 (emphasis added).

152.   Deutsche Bank had a similar company policy in place.  The FCA found that while Deutsche Bank's traders did make requests for false submissions on days when they had large fixings, they also "made requests on days they did not have fixings in the hope that Deutsche Bank's submissions would influence other Panel Banks *future* submissions."[80]

153.   These long-term manipulative efforts demonstrate how Defendants consistently made manipulative and false Sterling LIBOR submissions for their financial benefit throughout the Class Period.  This manipulative conduct rendered the prices of Sterling LIBOR-based derivatives artificial throughout the entire Class Period, causing legal injury to Plaintiffs and Class members who were forced to transact at artificial prices proximately caused by Defendants' manipulative conduct.

**D. Defendants Made False Bids and Offers in the Sterling Money Market**

154.   Defendants also engaged in a manipulative trading strategy referred to as "forcing LIBOR" at Defendant Lloyds[81] and "pushing cash" at Defendant Deutsche[82]  that involved making false "bids" and "offers," prices at which the bank was willing to borrow or lend funds, within the inter-bank money market. Distinct from making false Sterling LIBOR submissions, this conduct involved

---

[80] Deutsche Bank FCA Notice at 14 (emphasis added).

[81] Lloyds FCA Notice at 13.

[82] Deutsche Bank CFTC Order at 15.

publishing false pricing information directly to the money market in order to create artificial prices for Sterling LIBOR-based derivatives.

155.   This manipulative trading strategy worked by creating artificial supply and demand for short term Sterling-denominated deposits, thereby altering the rates at which banks offered to lend Sterling to each other in the inter-bank money market.

156.   Because Sterling LIBOR is supposed to represent the inter-bank offered rate on Sterling deposits, by manipulating Sterling money market rates through, *inter alia*, placing false bids and offers for Sterling deposits, Defendants manipulated the prices of Sterling LIBOR-based derivatives to artificial levels during the Class Period for their financial benefit.

157.   Lloyds' FCA Final Notice demonstrates how Defendants planned and executed one of these coordinated efforts to "force" Sterling LIBOR higher.[83]  This coordinated manipulation of Sterling LIBOR involved at least one unidentified inter-dealer broker, "Broker B," and traders from at least one other co-conspirator bank who served as a counterparty to manipulate Sterling LIBOR-based derivatives trades.[84]

158.   The scheme began on August 31, 2006, when Lloyds and Broker B began discussing a plan to enter into a series of forward rate agreements

---

[83] Lloyds FCA Notice at 13.

[84] *Id.*

("FRAs")[85] that were priced based on one-month Sterling LIBOR during September 2006.[86]  These were sham transactions, arranged by Broker B to conceal the nature of Defendants' manipulative scheme.  For example, in a recorded phone call to Trader F, Broker B explains the need for a complicit counterparty:

> **August 31, 2006**: (phone call to Lloyds Trader F)
>
> Broker B: I'll have [bank] there as well…because that's what you want. You don't want the market knowing what you're fucking doing[87]

159.   In accordance with their plan, on September 21, 2006, Lloyds Trader F entered into a series of forward rate agreements with the counterparty arranged by Broker B.[88]  These FRAs had a notional value of £10 billion and had a fixed rate of interest equal to 4.925%; they were due to settle in just four days, on September 25, 2006.[89]

160.   To generate illicit profits from these Sterling LIBOR-based derivatives, Lloyds Trader F needed to force one-month Sterling LIBOR higher

---

[85] In a forward rate agreement, the parties agree to pay or receive interest based on some underlying notional amount, *e.g.* $1,000,000, on a certain future date.  Typically, one party agrees to pay a fixed rate of interest on the underlying notional amount, *e.g.*, 3%, and receive floating interest rate payments equal to LIBOR, while the other party makes floating interest rate payments based on LIBOR and receives fixed interest rate payments.  On the settlement date, the party receiving the greater interest rate payment is paid the difference between the fixed and floating interest rate.  For example, if at settlement LIBOR is 3.5%, *i.e.*, 0.5% higher than the agreed upon fixed rate of interest, the party receiving floating rate payments will be paid 0.5% interest on the underlying notional amount.

[86] Lloyds FCA Notice at 13.

[87] *Id*.

[88] *Id*.

[89] *Id*.

than the fixed 4.925% interest rate due under the agreements.  To this end, Lloyds Trader F and Broker B immediately implemented the "forcing LIBOR" strategy. They coordinated the over-bidding for Sterling deposits in the money market "to force the LIBOR up over a tick and a half," financially benefiting the FRAs.[90]  As Lloyds' Trader F explained to Broker B, by over-bidding for Sterling LIBOR deposits, they artificially increased demand. Trader F, Broker B, and their unidentified co-conspirators (referred to as "them" in the conversation below) artificially raised rates in the inter-bank money market, forcing Sterling LIBOR higher, and increasing the value of the FRAs:

**September 25, 2006**:

Trader F: (to Broker B) I have told them my plan…I want to bid everything, so all LIBOR force up the one month[91]

161.   The plan was successful.  Lloyds bid one-month Sterling higher until 11:11 A.M. on September 25, 2006, when one-month Sterling LIBOR was fixed at 4.9575%.[92]  As a result of this concerted manipulative conduct and artificially higher Sterling LIBOR fix, Lloyds made £266,063 in illicit profits on the FRAs.[93]

---

[90] *Id*.

[91] *Id*.

[92] *Id*.

[93] *Id*.

This strategy was successfully repeated throughout the Class Period including at least two more times before the end of 2006.[94]

### E. Defendants Engaged in Sham Transactions at Times of Decreased Liquidity to Maximize the Impact of Their Manipulative Conduct

162.   To increase the impact of manipulative trading strategies like "forcing LIBORs" or "pushing cash," Defendants coordinated their bids and offers to focus on times of the day when the Sterling money market was illiquid, *i.e.*, trading volume was reduced.  Normally, transacting in an illiquid market causes one to receive a worse price, *i.e.*, a seller sells for less and a buyer pays more to buy.  Here, contrary to normal market practice, Defendants intentionally transacted in an illiquid market precisely in order to have the greatest manipulative effect on the market.

163.   Traders at Defendant Lloyds planned their sham Sterling money market transactions at times when the market was illiquid.  This both maximized the impact of their manipulative conduct and reduced the chance that Lloyds would actually have to stand by the bids they were placing in the market and overpay for Sterling deposits.  As one Lloyds Sterling LIBOR-based derivatives trader explained, when it comes to forcing LIBOR, "**you've got to do it when people**

---

[94] *Id.*

**can't lend.**"[95]   At these times, the likelihood of Lloyds' bids actually being fulfilled was reduced, and the amount of impact on the market was increased.

164.   Deutsche Bank employed a similar strategy.   For example, in the conversation below, Deutsche Bank traders discuss the need to coordinate their sham bids and offers in the Euro money market at "times when the cash market is even thinner than normal" to maximize the impact of their manipulative trading strategy:

> **September 7, 2006**: (chat message to Trader-3)
>
> Naturally we can not give cash in size due to bs limits but we can take in cash without restriction. Since DB has a good name in the market, we suhd be able to rise some size. This impact becomes even bigger when we do this in times when the cash market is even thinner than normal (ie. Year end)[96]

165.   Deutsche Bank senior management knew and approved of this manipulative trading strategy.   Following the conversation above, Deutsche Bank Submitter 4 shared the details of this planed manipulative conduct with Deutsche Bank Senior Manager 6 and Deutsche Bank Manager 5, estimating the "total profit possible EUR 2mn."[97]   Despite being informed of the trader/submitter's intent to start "pushing cash," senior management did not discipline, reprimand, or discourage the use of this manipulative trading strategy.

---

[95] Lloyds FCA Notice at 13 (emphasis added).

[96] Deutsche Bank DOJ Statement of Facts at 28.

[97] *Id.*

### F. Defendants Intentionally Re-Organized Their Sterling LIBOR-Based Derivatives Desks to Facilitate and Encourage Manipulative Conduct

166.   Defendants' manipulation of Sterling LIBOR was not an accident.  On the contrary, it was the result of a conscious effort by senior management to increase profits precisely by encouraging its LIBOR submitters and LIBOR-based derivatives traders to engage in unlawful conduct.

167.   For example, in 2006 Deutsche Bank merged its Pool Trading and Money Markets Derivatives ("MMD") desks to increase the bank's trading profits by aligning the desks' trading positions across all LIBOR currencies.[98]

168.   As a result of the merger, Deutsche Bank's MMD derivatives traders sat next to Deutsche Bank's cash traders who were also LIBOR submitters.[99] Deutsche Bank's Global Senior Manager instructed all traders to have open communications across offices, including those in New York, and instilled an expectation that LIBOR-based derivatives traders and LIBOR submitters would communicate routinely about market conditions and trading positions.[100]

169.   In fact, management encouraged Deutsche Banks' employees to manipulate LIBOR for all currencies.  Deutsche Bank Senior Manager-1, who was the head of Deutsche Bank's Global Finance and FX Forwards desk, knew of Deutsche Bank's involvement in the LIBOR manipulation scheme.  Instead of

---

[98] Deutsche Bank CFTC Order at 8.

[99] *Id.*

[100] *Id.*

taking corrective action, and discouraging activity that he knew was unlawful, Senior Manager-1 encouraged at least one trader in his annual performance review to increase his relationship with money market traders "to control the short date [LIBOR] setting with cash and derivatives."[101]

170.   Deutsche Bank used this new organizational structure to promote a corporate culture that focused on manipulating LIBOR for all currencies to generate illicit trading profits.  Deutsche Bank's Global Senior Manager and other senior traders, including the London manager of its MMD desks ("London MMD Manager"), had weekly meetings to discuss a manipulative trading strategy based on increasing the "spread," or difference, between the different tenors of LIBOR, by, *inter alia*, making false LIBOR submissions.[102]  The intention of these meetings was to ensure that this trading strategy was well known and utilized across currency desks by Deutsche MMD and Pool Traders.[103]

171.   As a result of being indoctrinated with Global Senior Manager's manipulative trading strategy, Deutsche Bank's LIBOR submitters not only accommodated requests for false submissions from LIBOR-based derivatives traders, but also "built this bias" for an increasing spread between tenors into

---

[101] Deutsche Bank DOJ Statement of Facts at 66-67.

[102] *See* Deutsche Bank CFTC Order at 9.

[103] *Id.*

Deutsche Bank's LIBOR submissions throughout the Class Period.[104] Even in the absence of specific oral or written requests for false submissions from Deutsche Bank traders, Deutsche Bank submitters still consistently made false LIBOR submissions for Deutsche Bank's financial benefit.[105]

172.   The strategy was extremely successful.  Following implementation, Deutsche Bank's MMD desk's revenue increased by almost 400% from €399 million in 2007, to €1.92 billion in 2008, accounting for 14.27% of Deutsche Bank's *total* revenue during that year.[106]  As a result of this astronomical increase in revenue, Deutsche Bank's London MMD Manager personally received a bonus of £90 million in 2008, or around $140 million.[107]

173.   In order to manipulate more effortlessly, UBS also made similar seating arrangements among traders and submitters.  From at least January 2005 through September 2009, derivatives traders on UBS's Short Term Interest Rates or "STIR" desk traded short-term interest rate derivatives and made submissions for all LIBOR currencies, except U.S. Dollar LIBOR and Euro LIBOR.[108]

174.   The STIR desk managed both UBS's interest rate risk and short term cash position, engaging in transactions for interest rate derivatives and cash trading

---

[104] *Id.*

[105] *Id.*

[106] *Id.*

[107] *See* Deutsche Bank DOJ Statement of Facts at 22-23.

[108] UBS CFTC Order at 8.

in the money markets for each currency, including Sterling.[109]

175.   Under UBS's scheme, Sterling LIBOR-based derivatives traders were not just seated next to Sterling LIBOR submitters.  The traders also made the submissions themselves.  By placing Sterling LIBOR derivatives traders (whose compensation was directly based on the performance of their trading books) in charge of determining UBS's Sterling LIBOR submissions, UBS created a direct conflict of interest between the traders' profit motive and their responsibility to submit Sterling LIBOR quotes that reflected UBS's true cost of borrowing, in direct contravention of the stated BBA submission rules.

176.   Rabobank employed an almost identical structure.  In 2004, Rabobank combined its money markets desks, which were responsible for cash trading and funding the bank, with its short-term interest rate derivatives desk, which traded derivatives that were priced, benchmarked, and/or settled based on Sterling LIBOR.[110]  Rabobank then assigned responsibility for making the bank's Sterling LIBOR submissions to the very traders whose positions, including those in foreign exchange forwards, were valued based on Sterling LIBOR.[111]  As a result, those traders made false Sterling LIBOR submissions to financially benefit those trading

---

[109] *Id.*

[110] *See* Rabobank CFTC Order at 6.

[111] *Id.* at 2.

positions,[112] once again in direct-contravention of the stated BBA submission rules.

177.   As with Deutsche Bank, Rabobank's Senior Manager, who was the bank's representative to the BBA, expected LIBOR-based derivative traders and submitters across all currencies, including Sterling LIBOR, to communicate about market conditions and individual trading conditions.[113]  Rabobank's Senior Manager openly discussed trading positions with LIBOR-based derivative traders and submitters using Bloomberg Instant Messages and email, encouraging Rabobank employees in different offices to share information about preferred LIBOR rates that would financially benefit their positions.[114]

178.   In October 2006, RBS's senior management also reorganized its trading desks so that derivatives traders and money market traders, some of whom were also LIBOR submitters, would share the same physical location within the firm.[115]  The co-location plan, known as the Short-Term Markets Desk ("STM"), was expressly intended to encourage derivatives and money market traders to share market information that could impact trading and funding decisions.[116]

---

[112] *Id*. at 6.

[113] *Id*.

[114] *Id*.

[115] RBS CFTC Order at 6.

[116] *Id.*

179.   This new seating arrangement amplified the pre-existing conflict of interest between the profit motive of LIBOR-based derivatives traders, whose compensation was directly based on the performance of their trading book, and the responsibility of LIBOR submitters who, according to BBA guidelines, were required to submit RBS's true cost of borrowing in the inter-bank market without any reference to the bank's LIBOR-based derivatives positions.[117]

180.   RBS's LIBOR-based derivatives traders quickly took advantage of this new arrangement. They shared their view of market conditions with RBS's primary LIBOR submitter.  They shared their derivatives positions with such submitter.  They strongly encouraged the submitter to make LIBOR submissions that would make those positions more profitable.[118]

## IV.   Plaintiffs Transacted in Sterling LIBOR-Based Derivatives at Artificial Prices Proximately Caused by Defendants' Manipulative Conduct

181.   During the Class Period, Plaintiffs engaged in U.S.-based transactions of Sterling LIBOR-based derivatives, including swaps and CME British pound futures contracts, at artificial prices proximately caused by Defendants' manipulative conduct.

---

[117] *Id.*

[118] *Id.*

A. **Plaintiff Frontpoint**

182.   A swap is an over-the-counter Sterling LIBOR-based derivative in which two parties exchange the obligation to make series of payments based on some underlying principal amount for a set period of time.

183.   There are many different types of Sterling LIBOR-based swaps.  For example, in the most common "plain vanilla" swap, the parties will typically agree to a "fixed-for-floating" exchange, in which one party will make payments based on a variable price or rate, *e.g.*, Sterling LIBOR, while the other will make payments based on a fixed rate, *e.g.*, 0.5%, for the same notional amount. Counterparties may also use swaps to conduct a "floating-for-floating" exchange in which both parties agree to make payments based on a variable price or rate.  For example, one party can agree to make payments equal to the return on a certain stock or index, *e.g.*, $1,000,000 of IBM common stock, in exchange for receiving interest payments based on variable interest rate, *e.g.*, Sterling LIBOR, for the same notional amount.

184.   Payments under a swap contract are due at regular intervals, *e.g.*, every month, for the duration of the agreement.  Each time a payment is due, the amounts owed by the two parties are netted against each other.  Only the party with the larger obligation will make a payment.  For example, assume Party A enters into a swap contract with Party B and agrees to make payments every six months

to Party B equal to the return on $1,000,000 of IBM stock. In exchange, Party B agrees to make payments to Party A every six months based on six-month Sterling LIBOR for the same $1,000,000 principal amount. On each "fixing" or "reset" date, if six-month Sterling LIBOR is greater than percentage return on IBM stock, Party B has the larger obligation and will make a payment to Party A. However, if IBM stock returns more on a percentage basis than six-month Sterling LIBOR, Party A has the larger obligation and will make a payment to Party B. As a result, Sterling LIBOR determines the value of a Sterling LIBOR-based swap by determining the amount paid or received by each party.

185.   Frontpoint engaged in U.S.-based swap transactions during the Class Period at artificial prices proximately caused by the Defendants' manipulative conduct. For example, on October 17, 2007, November 22, 2007, and November 29, 2007, Frontpoint entered into swap transactions with UBS AG, agreeing to make monthly interest rate payments on one-month Sterling LIBOR until December 2008, in exchange for receiving payments based on the return of certain shares traded on the London Stock Exchange. UBS admitted in its settlement with the DOJ that from at least as early as November 2007 through approximately July 2009, UBS's Sterling LIBOR submitters frequently received and accommodated requests from UBS's Sterling derivatives traders to alter UBS's Sterling LIBOR submissions to financially benefit their Sterling LIBOR-based derivatives

positions.  As a result of Defendants' manipulative conduct, Frontpoint was

damaged and suffered legal injury when it paid more and/or received in payments

less than it otherwise should have under these swap contracts.

## A. **Plaintiff Dennis**

186.   CME British pound futures contracts are priced based on Sterling

LIBOR.  Each CME British pound futures contract is an agreement to buy or sell

£62,500, in terms of U.S. Dollars, on some future date.  The cost of buying or

selling Sterling under a CME British pound futures contract is determined using a

formula that incorporates Sterling LIBOR.  The calculation involves taking the

"spot price" of Sterling for immediate delivery, and adjusting it to account for the

"cost of carry," *i.e.*, the amount of interest paid or received on Sterling deposits, for

the duration of the agreement.  Sterling LIBOR, the benchmark rate for Sterling

deposits, is used in this formula to calculate the cost of carrying Sterling over the

duration of the futures contract.  This is the same calculation used to determine the

price of Sterling foreign exchange forwards, which are identical to CME British

pound futures contracts, except that they are not traded on an exchange and thus

not subject to the standardized terms specified by the CME.  As a result, a

manipulation of Sterling LIBOR, renders the cost of buying or selling Sterling

under a CME British pound futures contract artificial.

187.   The relationship between Sterling LIBOR and the price at which Sterling is bought and sold under a CME British pound futures contract is a fact acknowledged by the CFTC.  The CFTC included the manipulation of Sterling foreign exchange forwards in Defendant Rabobank's $475 million LIBOR manipulation settlement.[119]  Because CME British pound futures contracts are identical to Sterling foreign exchange forwards, and are priced using the same formula, their prices were affected by Defendants' manipulative conduct in exactly the same way.  This pricing relationship is also supported by Defendants' conduct. For example, Defendant Deutsche Bank specifically involved its "FX" or foreign exchange forwards desk, which traded, *inter alia*, Sterling foreign exchange forwards, in the Sterling LIBOR manipulation.  This demonstrates the direct link between Sterling LIBOR and the prices of Sterling foreign exchange forwards.[120]

188.   Dennis engaged in U.S.-based transactions for CME British pound futures contracts during the Class Period at artificial prices proximately caused by Defendants' manipulative conduct.  For example, on May 11, 2010, Dennis initiated a long position by purchasing 28 June 2010 CME British pound futures contracts.  Dennis subsequently liquidated that position on May 13, 2010 by selling 28 June 2010 CME British pound futures contracts for a loss of $38,237.50.  This

---

[119] *See* Rabobank CFTC Order at 6 (listing Sterling foreign exchange forwards as being priced off of Sterling LIBOR).

[120] *See* Deutsche Bank FCA Notice at 2.

loss was directly and proximately caused by Defendants' manipulative conduct. For example, the CFTC found that from at least January 2005 to at least June 2010 UBS made knowingly false Sterling LIBOR submissions to financially benefit its Sterling LIBOR-based derivatives positions.[121]  Additionally, Deutsche Bank admitted to manipulating Sterling LIBOR through 2010, with communications showing that manipulative conduct continued until at least the September 2010 IMM date.  *See*, *e.g.*, ¶¶ 13, 150, *supra*.  As a result of Defendants' manipulative conduct, Dennis was damaged and suffered legal injury when he paid more for and/or received less than he otherwise should have for CME British pound futures contracts during the Class Period.

## B. **Plaintiffs Frontpoint & Dennis**

189.    Throughout the Class Period, Defendants engaged in a long-term, persistent manipulation of Sterling LIBOR for their financial benefit.  The CFTC, DOJ, and FCA all found that this manipulative conduct involved making false Sterling LIBOR submissions on a near-daily basis.  Defendants also engaged in a coordinated price fixing scheme in the Sterling money market, "pushing cash" or "forcing LIBOR" by, *inter alia*, submitting false bids and offers for Sterling money market interests, to manipulate inter-bank deposit rates and Sterling LIBOR.  By continuously making false Sterling LIBOR submissions and engaging in

---

[121] *See* UBS CFTC Order at 2.

manipulative trading conduct, Defendants caused the prices of Sterling LIBOR-based derivatives, including Sterling LIBOR-based swaps and CME British pound futures contracts, to be artificial throughout the Class Period.

190.   As a result, Plaintiffs Frontpoint and Dennis were deprived of the benefits of competition and average competitive prices.  Instead, Defendants directly and proximately caused Plaintiffs to transact in Sterling LIBOR-based derivatives at artificial prices. This proximately caused Plaintiffs Frontpoint and Dennis to suffer legal injury and antitrust injury on their Class Period transactions.

## TRADE AND COMMERCE

191.   Beginning on at least January 1, 2005, and continuing until at least December 31, 2010, Defendants engaged in a continuing contract, combination or conspiracy in restraint of trade in violation of the Sherman Act.

192.   During the Class Period, Defendants sold substantial quantities of Sterling LIBOR-based derivatives in a continuous and uninterrupted flow in interstate commerce to customers located in states other than the states in which Defendants produced Sterling LIBOR-based derivatives.

193.   The Defendants' business activities that are subject to this Complaint were within the flow of and substantially affected interstate trade and commerce.

194.   During the Class Period, the Defendants' conduct and their co-conspirators' conduct occurred in, affected, and foreseeably restrained interstate

commerce of the United States.

## **CLASS ACTION ALLEGATIONS**

195.    Plaintiffs brings this action pursuant to Rule 23 of the Federal Rules

of Civil Procedure on its own behalf and as representative of the following

Class:[122]

> All persons or entities that engaged in U.S.-based transactions in
> financial instruments that were priced, benchmarked, and/or settled
> based on Sterling LIBOR at any time from at least January 1, 2005,
> through at least December 31, 2010 (the "Class").
>
> Excluded from the Class are Defendants and their employees, agents,
> affiliates, parents, subsidiaries, and co-conspirators, whether or not
> named in this complaint, and the United States Government.

196.    The Class is so numerous that individual joinder of all members is

impracticable.  While the exact number of Class members is unknown to Plaintiffs

at this time, Plaintiffs are informed and believe that at least thousands of

geographically dispersed Class members transacted in Sterling LIBOR-based

derivatives worth trillions of dollars during the Class Period.

197.    Plaintiffs' claims are typical of the claims of the other members of the

Class.  Plaintiffs and the members of the Class sustained damages arising out of

Defendants' common course of conduct in violation of law as complained of

---

[122] Plaintiffs have defined the Class based on currently available information and hereby reserve the right to amend the definition of the Class, including, without limitation, membership criteria and the Class Period.

herein.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

198.   Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs are adequate representatives of the Class and have no interest which is adverse to the interests of absent Class members.  Plaintiffs have retained counsel competent and experienced in class action litigation, including commodities manipulation and antitrust litigation.

199.   Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class.  These common questions of law and fact include, without limitation:

    a.  Whether Defendants and their co-conspirators engaged in a combination or conspiracies to manipulate  Sterling LIBOR and the prices of  Sterling LIBOR-based derivatives in violation of the Sherman Act;

    b.  the identity of the participants in the conspiracies.

    c.  the duration of the conspiracies;

    d.  the character and nature of the acts performed by the Defendants in furtherance of their conspiracies;

    e.  whether Defendants' unlawful conduct caused injury to the business and property of Plaintiffs and the Class;

    f.  whether Defendants were unjustly enriched at the expense of Plaintiffs and the Class;

    g.  whether Defendants' unlawful acts violate RICO;

     h.   whether Defendants' unlawful conduct caused cognizable legal injury under the Commodity Exchange Act;

     i.   the appropriate measure of damages sustained by Plaintiffs and Class members.

200.   A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  Treatment as a class will permit a large number of similarly-situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for the Defendants.

201.   Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRADULENT CONCEALMENT

202.    The applicable statute of limitations relating to the claims for relief alleged in ¶¶ 208-293 herein were tolled because of fraudulent concealment involving both active acts of concealment by Defendants and inherently self-concealing conduct.

203.    The secret nature of Defendants' conspiracy - which relied on non-public methods of communication, including private instant messages, to conceal their agreements to manipulate Sterling LIBOR and the prices of Sterling LIBOR-based derivatives was intentionally self-concealing.  This concealment through secrecy prevented Plaintiffs from uncovering their unlawful conduct.[123]

204.    Defendants' affirmative acts of concealment used to hide their violations of law from Plaintiffs and the Class include, *inter alia* the following. First, Defendants knowingly submitted (or caused to be submitted) Sterling LIBOR quotes that were false, misleading, or inaccurate because they were manipulative, based in whole or in part on impermissible and illegitimate factors, such as the rate that would financially benefit Defendants' Sterling LIBOR-based derivatives positions and/or the Sterling LIBOR-based derivatives positions of their co-conspirators. Yet the BBA's Instructions required and, through the submissions and other actions as Panel Banks, Defendants impliedly represented that their

---

[123] *See*, *e.g.*, *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 514 (S.D.N.Y. 2003) ("[a]mong the principal allegations against Defendants are assertions that they reported false trade data to entities that collect that information for public dissemination. . . Such activities are inherently self-concealing").

submissions were a reliable and truthful assessment of, and only of, each's competitive market borrowing costs.  Indeed, because the BBA was Defendants' trade organization, Defendants were themselves representing through the Instructions that their submission would be in compliance thereunder.

205.   Second, Defendants engaged in (a) "spoofing" the Sterling money market by posting false bid and offers for Sterling deposits that were intended to manipulate the prices of Sterling LIBOR-based derivatives to artificial levels; and (b) "forcing LIBOR" or "pushing cash" by overbuying and/or overselling money market instruments to create artificial supply and demand.  Defendants also fail to disclose the truth of these acts which could only be successful if Defendants purposely concealed their true intentions from the market.

206.   Many, if not all, of these affirmative acts of concealment were also inherently self-concealing.  Defendants engaged in multiple forms of price fixing, which are inherently self-concealing and could not be detected by Plaintiffs or other members of the Class.[124]

207.   As a result, Plaintiffs and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by exercise of due diligence prior to the time when there were public

---

[124] *See In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*, 00 CIV 7804 (LMM), 2004 U.S. Dist. LEXIS 3892, at *15 (S.D.N.Y. Mar. 12, 2004) (recognizing that bid-rigging and price-fixing conspiracies are inherently self-concealing) (citing *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1084 (2d Cir. 1988)).

disclosures reporting the manipulation of Sterling LIBOR and the prices of Sterling

LIBOR-based derivatives.  Plaintiffs thus assert the tolling of the applicable

statutes of limitations affecting the rights of the claims for relief asserted by

Plaintiffs.  Defendants are also equitably estopped from asserting that any

otherwise applicable limitations period has run.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Agreement, Combination, or Conspiracy to Restrain Trade in**

**Violation of § 1 of the Sherman Act)**

**(The Sterling LIBOR Agreement)**

**(Coordinated Submission of False Sterling LIBOR Submissions to the BBA)**

**(Against all Defendants)**

208.   Plaintiffs hereby incorporate each preceding and succeeding

paragraph as though fully set forth herein.

209.   Due to the conduct of Defendants, the Sterling LIBOR Agreement

repeatedly caused non-competitive, manipulated, and artificial prices to be fixed

and disseminated in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

The Sterling LIBOR Agreement's fixing and publication of artificial and

manipulated prices constitutes a *per se* violation of § 1 and/or unreasonably and

unlawfully restrained trade in violation of § 1.

210.   In addition, or alternatively, Defendants and the John Doe Defendants Nos. 1-3, who are inter-dealer brokers, entered into a combination, agreement, or conspiracy in unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

211.   In addition or in the alternative, Defendants and the other John Doe Defendants Nos. 4-50 entered into a combination, agreement, or conspiracy in unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

212.   During the Class Period, Defendants entered into a series of agreements designed to create profit or limit liabilities amongst themselves by coordinating the manipulation of Sterling LIBOR and the prices of Sterling LIBOR-based derivatives, by conspiring to, *inter alia*, make false submissions to the BBA designed to artificially suppress, inflate, maintain, or otherwise alter Sterling LIBOR.

213.   This conspiracy to manipulate and fix the prices of Sterling LIBOR caused injury to both Plaintiffs and members of the Class because they were deprived of the benefit of a legitimate and accurate Sterling LIBOR that reflected actual market conditions.  Plaintiffs and members of the Class also were deprived of the ability to accurately price Sterling LIBOR-based derivatives entered into during the Class Period and to accurately determine the settlement value of

Sterling foreign exchange forwards and other Sterling LIBOR-based derivatives by reference to an accurate Sterling LIBOR.  Plaintiffs and members of the Class thus received, during the term of their transactions and upon settlement, less in value than they would have received absent Defendants' conspiracy and overt acts taken in furtherance thereof.

214.   Each agreement, combination, conspiracy alleged herein is a *per se* violation of § 1 of the Sherman Act.

215.   Alternatively, each agreement, combination, or conspiracy alleged herein resulted in substantial anticompetitive effects in the over-the-counter and exchange traded Sterling LIBOR-based derivatives market.  There is no legitimate business justification for, or pro-competitive benefits caused by the combination, conspiracy, or agreements alleged herein (including the Sterling LIBOR Agreement) and the overt acts taken in furtherance thereof.  There were no ostensible pro-competitive benefits of such overt acts which constituted manipulation and greatly harmed competition, depriving the markets, Plaintiffs, and the Class members of the benefits of competition. Any pro-competitive benefits are pretextual or could have been achieved by less restrictive means. These include simple enforcement by the BBA and the members of the Sterling LIBOR Agreement of the BBA Instructions.

216.   As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

217.   Plaintiffs and members of the Class seek treble damages for Defendants' violations of §1 of the Sherman Act under §4 of the Clayton Act.

218.   Plaintiffs and members of the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## SECOND CLAIM FOR RELIEF

**(For Price Fixing In Violation of § 1 of the Sherman Act)**

**(Non-Rate-Setting Collusion)**

**(Making False Bids and Offers, Engaging in Sham Transactions, and Coordinating Manipulative Trading of Sterling LIBOR-Based Derivatives)**

**(Against All Defendants)**

219.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

220.   Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

221.   During the Class Period, Defendants entered into a series of agreements designed to create profit or limit liabilities amongst themselves by

coordinating the manipulation of Sterling LIBOR and the prices of Sterling LIBOR-based derivatives, by conspiring to, *inter alia*: (a) make false bids and offers for Sterling money market instruments; (b) arrange for sham transactions between co-conspirators; and (c) employ manipulative trading strategies, including intentionally trading when the Sterling money market was illiquid, designed to artificially suppress, inflate, maintain, or otherwise alter Sterling LIBOR and the prices of Sterling LIBOR-based derivatives.

222.   This conspiracy to manipulate and fix the prices of Sterling LIBOR-based derivatives caused injury to both Plaintiffs and members of the Class because it destroyed the legitimizing price discovery function of the Sterling money market and deprived them of the benefit of a legitimate and accurate Sterling LIBOR that reflected actual money market conditions.  As a result, Plaintiffs and members of the Class were deprived of the ability to accurately price Sterling LIBOR-based derivatives entered into during the Class Period and to accurately determine the settlement value of Sterling foreign exchange forwards and other Sterling LIBOR-based derivatives.  Plaintiffs and members of the Class thus received, during the term of their transactions and upon settlement, less in value than they would have received absent Defendants' conspiracy and overt acts taken in furtherance thereof.

223.   The conspiracy is a *per se* violation of § 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the over-the-counter and exchange traded Sterling LIBOR-based derivatives market. There is no legitimate business justification for, or pro-competitive benefits caused by, Defendants' conspiracy and overt acts taken in furtherance thereof.  Any ostensible pro-competitive benefits are pretextual or could have been achieved by less restrictive means.

224.   As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

225.   Plaintiffs and members of the Class seek treble damages for Defendants' violations of §1 of the Sherman Act under §4 of the Clayton Act.

226.   Plaintiffs and members of the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## THIRD CLAIM FOR RELIEF

**(Manipulation in Violation of the Commodity Exchange Act)**

**(7 U.S.C. §§ 1, *et seq*.)**

**(Against All Defendants)**

94

227.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

228.   Each Defendant is liable under §§ 6(c), 9, and 22, of the CEA, codified at 7 U.S.C. §§ 9, 13, and 25 respectively, for the manipulation of Sterling LIBOR and the prices of Sterling LIBOR-based derivatives that were priced, benchmarked, and/or settled based on Sterling LIBOR.

229.   Defendants had the ability to manipulate Sterling LIBOR and the price of Sterling LIBOR-based derivatives.  Defendants, through interstate commerce, knowingly submitted or caused to be submitted false rate quotes to the BBA.  These submissions were used to determine the official published Sterling LIBOR.  By virtue of the Sterling LIBOR methodology, the Defendants had the ability to influence and did affect the rates that would become the official Sterling LIBOR.  Further, because of their market power as major dealers of Sterling LIBOR-based derivatives, the Defendants had the ability to influence and did affect the prices of Sterling LIBOR-based derivatives.

230.   As evidenced by communications revealed to the DOJ, CFTC, and FCA, the Defendants fully, intentionally, and systematically manipulated Sterling LIBOR and Sterling LIBOR-based derivatives prices to artificial levels for the express purpose of obtaining hundreds of millions (if not billions) of dollars in illegitimate profits on Sterling LIBOR-based derivatives, held by themselves or

other co-conspirators, the prices of which (and thus profits or losses) were priced, benchmarked and/or settled based on Sterling LIBOR.  As an intended and direct consequence of Defendants' knowingly unlawful conduct, the prices of Plaintiffs' Sterling LIBOR-based derivatives, and those traded by Class members, were manipulated to artificial levels by Defendants.

231.   During the Class Period, Sterling LIBOR and the prices of derivatives that were priced, benchmarked, and/or settled based on Sterling LIBOR were artificial and did not result from legitimate market information, competition, or supply and demand factors.  Defendants directly caused artificial Sterling LIBOR and artificial prices of Sterling LIBOR-based derivatives by, *inter alia*, making false Sterling LIBOR submissions to the BBA and conducting manipulative trading activity in the Sterling money market that created artificial supply and demand.

232.   As a direct result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered actual damages and injury in fact due to artificial Sterling LIBOR and prices of derivatives that were priced, benchmarked, and/or settled based on Sterling LIBOR.

## FOURTH CLAIM FOR RELIEF

**(Principal-Agent Liability in Violation of § 2 of the Commodity Exchange Act)**

**(Against All Defendants)**

96

233.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

234.   Each Defendant is liable under § 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

235.   Plaintiffs and members of the Class seek the actual damages they sustained in Sterling LIBOR-based derivatives for the violations of the CEA alleged herein.

## FIFTH CLAIM FOR RELIEF

### (Aiding and Abetting Liability in Violation of § 22 of the Commodity Exchange Act)

### (Against All Defendants)

236.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

237.   Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.  Defendants did so knowing of each other's manipulation of Sterling LIBOR and willfully intended to assist these manipulations, which resulted in artificial Sterling LIBOR-based derivatives prices during the Class Period in violation of § 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

238.   Plaintiffs and members of the Class seek the actual damages they sustained in Sterling LIBOR-based derivatives for the violations of the CEA alleged herein.

## SIXTH CLAIM FOR RELIEF

**(Violation of the Racketeer Influenced and Corrupt Organizations Act)**

**(18 U.S.C. §§ 1961 *et seq*.)**

**(Against All Defendants)**

239.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

### A. Defendants Engaged in Conduct Actionable Under RICO

240.   18. U.S.C. § 1962(c) makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

241.   18 U.S.C. § 1962(d), in turn, makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

242.   Under 18 U.S.C. § 1961(1), an as applicable to § 1962, "racketeering activity" means (among other things) acts indictable under certain sections of Title 18, including 18 U.S.C. § 1343 (relating to wire fraud).

243.  18 U.S.C. § 1961(5) provides that, to constitute a "pattern of racketeering activity," conduct "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and at least the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

244.  18 U.S.C. § 1961(3) defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property," and 18 U.S.C. § 1961(4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

245.  18 U.S.C. § 1343, the wire fraud statute listed in 18 U.S.C. § 1961(1) as a RICO predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representation, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such a scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

246.  At all relevant times, an association-in-fact consisting of Defendants, Defendants' employees and agents, who conducted Defendants' affairs through

illegal acts including the transmission of false Sterling LIBOR submissions or directing other employees and agents to intentionally manipulate Sterling LIBOR rates by wire communications, and the BBA were an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

247.   At all relevant times, Defendants were "person[s]" within the meaning of 18 U.S.C. § 1961(3).

**B. Defendants Conducted the Affairs of a RICO Enterprise**

248.   Defendants' association-in-fact, through their frequent and routine communications with each other, their organization of a hub-and-spoke conspiracy through interdealer brokers, association with the BBA, and participation together as members in the Sterling LIBOR panel, constitutes a RICO enterprise.

249.   Defendants conducted the affairs of the enterprise through a pattern of racketeering activity by transmitting or causing to be transmitted false and artificial Sterling LIBOR submissions throughout the Class Period.  Within the United States, Defendants would on a regular basis communicate through the mails and interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning market information or conditions that affect or tend to affect the price of any commodity in interstate commerce.

250.   Defendants caused the enterprise to transmit an electronic spreadsheet to Thomson Reuters.  Through their collusive activities in Sterling LIBOR submissions and the daily transmission of an electronic spreadsheet setting forth those submissions, Defendants conducted the affairs of the enterprise through a pattern of racketeering activity, knowingly transmitting or causing to be transmitted false LIBOR submissions.

    a.   Defendants UBS and Deutsche Bank have both pled guilty to felony wire fraud and admitted their role in manipulating LIBOR; and

    b.   Defendants RBS and Barclays have already admitted that their wrongful acts were intentional to benefit, at least in part, their profits. *Barclays Statement of Facts*, ¶ 50; *RBS Statement of Facts*, ¶ 83.

    c.   As alleged above, all Defendants engaged in the same or substantively the same behavior as the already guilty behavior.

251.   Defendants completed all elements of wire fraud within the United States or while crossing United States borders.  Defendants did so by conducting the affairs of the enterprise through a pattern of racketeering activity, including by: (i) transmitting or causing to be transmitted false Sterling LIBOR quotes in the U.S. or while crossing U.S. borders through electronic servers located in the United States; (ii) transmitting or causing to be transmitted false and artificial Sterling LIBOR quotes that were relied upon by Thomson Reuters and the BBA in

collecting, calculating, publishing, and/or disseminating the daily Sterling LIBOR fix that was transmitted, published, and disseminated in the United States or while crossing U.S. borders through electronic servers located in the United States, which fix was in turn relied upon by Plaintiffs and Class members as accurately reflecting Defendants' competitive borrowing rates; (iii) coordinating their daily Sterling LIBOR submissions and their Sterling LIBOR-based derivatives trading positions in electronic chats routed through electronic servers located in the United States; (iv) sending trade confirmations based on manipulated Sterling LIBOR rates to counterparties in the United States; and (v) executing sham transactions, including wash trades, through inter-dealer brokers.  In total, this conduct constituted hundreds of predicate acts of wire fraud.

252.   It is clear that even though the BBA may be a foreign entity, the elements of the wire fraud were completed in the United States.  This is evidenced by many phone conversations, electronic chats, electronic mail from the Defendants in the United States, false wire submissions to Thomson Reuters, and various agreements between the CME and BBA.  It is also evident that the alleged manipulation was directed directly at and did affect interstate commerce in the United States, creating false and manipulated prices for Sterling LIBOR related derivatives.

253.   Further, Defendants would have been unable to carry out their manipulative scheme without the use of telephone wires, or electronic communication due to the time-sensitive nature of the Sterling LIBOR fix and the way in which the information was disseminated to Thomson Reuters and throughout the United States.

254.   The CFTC has already concluded that Defendant Deutsche Bank, through its submitters and traders, some of whom were located in New York, routinely made false submissions for Sterling LIBOR.  They did so by acting "knowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce. . ."[125]

255.   In addition to phone conversations, the CFTC found that Defendant Deutsche Bank employees would routinely communicate using Bloomberg chat terminals and the internal Deutsche Bank electronic messaging system to discuss and receive preferential Sterling LIBOR requests.[126] As demonstrated above, other Defendants, including at least UBS and RBS, also used electronic Bloomberg chats

---

[125] Deutsche Bank CFTC Order at 36 (quoting 7 U.S.C. § 13(a)(2) (2006)).

[126] *Id.* at 8.

to communicate information regarding their trading positions and to coordinate their false Sterling LIBOR submissions during the Class Period.

256.   Further, the Defendants, through the BBA, made agreements with the CME, in the United States, which helped them to further their illegal acts.  To increase interest in Sterling futures contracts, the Chicago-based CME proposed that the BBA allow them to use the BBA's LIBOR calculation as the basis for the Futures contracts amounts.  Since 2005, New York-based Thomson Reuters has been the BBA's agent for determining and distributing LIBOR.  This change was approved by the CFTC and trading, both in the exchange's Chicago pits and through the CME's Globex electronic exchange,[127] encouraged the exponential global growth of trading in Sterling LIBOR futures contracts.

257.   For example, the CME's agreement with the BBA permitted the Exchange to use BBA LIBOR as the basis for settling Sterling futures contracts and to refer to BBA LIBOR in connection with creating, marketing, trading, clearing, settling and promoting Sterling futures contracts.[128]

258.   Defendants, who were part of the BBA Sterling LIBOR panel, knew that the BBA benefited financially from this relationship with the CME.  This

---

[127] CME Rulebook, Chapters 254 and 254(a) (Chicago Mercantile Exchange, Inc.) available at http://www.cmegroup.com/rulebook/CME/III/250/254/254.pdf.

[128] *CME 2012 Annual Report* at 8 ("We currently have a licensing and membership agreement with BBA Enterprises Limited and the British Bankers' Association (collectively BBA) for the use of LIBOR to settle several or our interest rate products, including our Eurodollar contract.  For the license, we paid an upfront fee and pay an annual fee. Based on the ongoing review of LIBOR, we expect LIBOR to be reformed rather than replaced and to continue as a regulated benchmark. Depending upon the outcome of the reform efforts, we may need to enter into a new license agreement with the BBA or the organization appointed to administer the benchmark").

contract between the BBA and CME for LIBOR rates, a contract in interstate commerce, underscores the strength of the causal connection between the pricing of LIBOR and the pricing of the Sterling futures and shows that Defendants knew that their manipulation of LIBOR rates would manipulate Sterling futures in turn.

259.   The licensing of LIBOR by the BBA to the CME also constitutes a contract for LIBOR in interstate commerce.

260.   By transmitting or causing false and artificial Sterling LIBOR submissions to be transmitted electronically to Thomson Reuters and the BBA, and by exchanging Sterling LIBOR-based derivative positions and prices, Defendants conducted the affairs of an enterprise through a pattern of racketeering activity which artificially fixed and affected the prices of Sterling LIBOR-based derivatives, directly resulting in Defendants reaping hundreds of millions, if not billions, of dollars in illicit trading profits on their Sterling LIBOR-based derivatives positions.

261.   As members of the BBA Sterling LIBOR panel and through their organization of a hub-and-spoke of interdealer brokers and submitters, the Defendants had the motive and opportunity to commit fraud and profit to the tune of hundreds of millions, if not billions, of dollars.

### C.      Defendants Have Conducted the Affairs of an Enterprise Through a Pattern of Racketeering Activity

262.   Defendants each committed far more than two predicate acts of wire

fraud.  As alleged in detail herein, Defendants engaged in at least the following

predicate acts of wire fraud:

> a. Electronic chats between U.S.-based money-markets traders and Sterling LIBOR submitters;
>
> b. Telephone communications between the United States based money-market traders;
>
> c. Subsequent Sterling LIBOR submission from the defendant to Thomson Reuters; and
>
> d. Subsequent publication of a Sterling LIBOR rate through international and interstate wires; and sending by electronic means (e-mail, message, telephonic, facsimile) trade confirmations based on manipulated, false, and artificial LIBOR rates to counterparties in the United States.

263.   The conduct of every party involved in the scheme is not an isolated

occurrence.  The pattern of racketeering activity herein alleged involved not

isolated occurrences but constituted related acts which amounted to a threat of

continued criminal activity throughout the Class Period.  Each Defendant shared a

common purpose in increasing their profits from trading in instruments priced from

Sterling LIBOR, and also had a common method of conducting the affairs of the

enterprise through a pattern of racketeering activity through use of the wires in

transmitting false Sterling LIBOR reports and placing trades in conformity

therewith.

264.   Further, each day the Defendants made Sterling LIBOR submissions there was an implied understanding that they were complying with the BBA's Instruction and submitting a competitive borrowing rate.

265.   However, the submissions made by the Defendants were systematically false and in violation of the BBA's Instructions.  The Defendants made these systematically false transmissions for their own benefit and to the detriment of the class and competition.  Further, the Defendants caused these false transmissions to be sent daily over interstate wires in the United States.

266.   Defendants acted in a uniform way to conduct the affairs of the enterprise through daily submissions and electronic communication of their collusive and artificial Sterling LIBOR submissions to the BBA and Thomson Reuters, following uniform procedures used in virtually an identical way each day. As alleged herein, the predicate acts had a closed-ended continuity involving a closed period of repeated conduct in colluding to set Sterling LIBORs, reporting the false Sterling LIBORs, and trading to benefit therefrom, throughout the Class Period.

**D.    The Pattern of Racketeering Activity Was Directed to, and Did Affect, Interstate Commerce**

267.   Through the racketeering scheme described above, Defendants conducted the affairs of the enterprise through a pattern of activity to illegally increase their profits to the detriment of investors in Sterling LIBOR-based

derivatives residing throughout the United States, and/or transacting in Sterling

LIBOR-based derivatives within the United States.

268.   Plaintiffs' allegations herein arise out of, and are based on,

Defendants' use of the Internet and/or the wires across state lines as well as

agreements between entities in different states to manipulate Sterling LIBOR and

the price of Sterling LIBOR-based derivatives.  Using those interstate channels to

coordinate the scheme and transmit fraudulent statements to Plaintiffs across state

lines satisfies RICO's requirement of an effect on interstate commerce.

Defendants' racketeering acts had a direct effect on interstate commerce.

269.   The predicate acts directly affected and made artificial the prices of

futures contracts which were traded on the CME.  These contracts are traded in an

open outcry form in Chicago and also electronically on the CME's GLOBEX

platform.

270.   The primary purpose of Defendants' racketeering activity was to

benefit the Defendants' derivative trading positions, including the positions held by

their United States entities and therefore injured the Class Members who could not

have been aware of the Defendants' manipulative scheme.

**E.      Plaintiffs Suffered Injury Proximately Caused by the Pattern of
          Racketeering Activity**

271.   As alleged herein, Plaintiffs and members of the Class are direct

victims of Defendants' wrongful and unlawful conduct.  Plaintiffs' and the Class'

injures were the direct, proximate, foreseeable, and natural consequences of Defendants' pattern of racketeering activity; indeed, injuring Plaintiff and the Class in their business or property relative to their Sterling LIBOR-based derivatives contracts was the very purpose of the Defendants' scheme.

272.    Plaintiffs and members of the Class seek treble damages for the injuries they have sustained, as well as restitution, cost of suit, and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

273.    Plaintiffs and members of the Class also seek an order, in accordance with 18 U.S.C. § 1964(a) enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

## SEVENTH CLAIM FOR RELIEF

**(Violation of the Racketeer Influenced and Corrupt Organizations Act)**
**18 U.S.C. §§ 1961 *et seq*.**
**(Against all Defendants)**

274.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

275.    Apart from construction and carrying out the racketeering scheme detailed above, Defendants conspired to violate RICO, constituting a separate violation of RICO under 18 U.S.C. § 1962(d).

276.    The fraudulent scheme, as set forth above, alleges a violation of RICO in and of itself.

277.   Defendants organized and implemented the scheme, and ensured it continued uninterrupted, by concealing their manipulation of Sterling LIBOR and the prices of Sterling LIBOR-based derivatives from Plaintiffs and members of the Class.

278.   Defendants knew their manipulative scheme would defraud participants in the Sterling LIBOR-based derivatives market yet each Defendant agreed to participate despite their understanding the fraudulent nature of the enterprise.

279.   As alleged herein, Plaintiffs and members of the Class are direct victims of Defendants' wrongful and unlawful conduct.  Plaintiffs' and the Class' injuries were direct, proximate, foreseeable, and natural consequences of Defendants' conspiracy; indeed, those effects were precisely why the scheme was concocted.

280.   Plaintiffs and members of the Class are entitled to recover treble damages of the injuries they have sustained, according to proof, as well as restitution and costs of suit and reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c).

281.   As a direct and proximate result of the subject racketeering activity, Plaintiffs and members of the Class are entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in

their unlawful conduct.

## EIGHTH CLAIM FOR RELIEF

### (Unjust Enrichment in Violation of Common Law)

### (Against all Defendants)

282.   Plaintiffs hereby incorporate each preceding and succeeding

paragraph as though fully set forth herein.

283.   To the extent required, this claim is pled in the alternative to

Plaintiffs' Ninth Claim for Relief in accordance with FED. R. CIV. P. 8(d).

284.   Defendants and members of the Class, including Plaintiffs, entered

into Sterling LIBOR-based derivatives transactions.  These transactions were

priced, benchmarked, and/or settled based on Sterling LIBOR, which was

supposed to reflect actual market conditions.  Rather than compete honestly and

aggressively with each other, Defendants colluded to manipulate Sterling LIBOR

and the prices of Sterling LIBOR-based derivatives to ensure they had an unfair

advantage in the marketplace.

285.   Defendants financially benefited from their unlawful acts described

herein, including but not limited to, coordinating the manipulation of Sterling

LIBOR by taking advantage of the BBA submission process, placing false bids and

offers for Sterling money market instruments, or engaging in other activities designed to artificially suppress, inflate, maintain, or otherwise alter Sterling LIBOR and the prices of Sterling LIBOR-based derivatives.  These unlawful and inequitable acts caused Plaintiffs and Class members to suffer injury, lose money, and otherwise be deprived of the benefit of accurate Sterling LIBOR reflecting actual market conditions, as well as the ability to accurately price, benchmark, and/or settle Sterling LIBOR-based derivatives transactions.  As a result, Plaintiffs and Class members received, upon execution or settlement of their trades, less in value than they would have received absent Defendants' wrongful conduct. Plaintiffs and the Class' losses correspond to Defendants' unlawful gains.

286.   Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiffs and members of the Class.

287.   Plaintiffs and members of the Class seek restoration of the monies of which they were unfairly and improperly deprived as described herein.

## NINTH CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)
### (Against Defendant UBS)

288.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

289.   To the extent required, this claim is pled in the alternative to Plaintiffs' Eighth Claim for Relief in accordance with FED. R. CIV. P. 8(d).

290.   Plaintiff Frontpoint entered into binding and enforceable contracts with Defendant UBS in connection with transactions for Sterling LIBOR-based derivatives, including Sterling LIBOR-based swaps.  *See* ¶¶ 182-185, *supra*.

291.   Each contract includes an implied covenant of good faith and fair dealing, requiring each contracting party to act in good faith and deal fairly with the other, and not to take any action which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

292.   Defendant UBS breached its duty to Frontpoint and, without reasonable basis and with improper motive, acted in bad faith by, among other things, (a) intentionally making false Sterling LIBOR submissions to the BBA for the express purpose of generating illicit profits from its Sterling LIBOR-based derivatives positions; and (b) conspiring with other Defendants to manipulate Sterling LIBOR and the prices of Sterling LIBOR-based derivatives.

293.   As a direct and proximate result of these breaches of the implied covenant of good faith and fair dealing and of Defendants' frustration of the purpose of these contracts, Plaintiff Frontpoint, and similarly situated members of the Class, have been damaged as alleged herein in an amount to be proven at trial.

113

# **PRAYER FOR RELIEF**

Plaintiff demands relief as follows:

A.     That the Court certify this lawsuit as a class action under Rules 23(a), (b)(2), and (b)(3), of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representative, and that Plaintiffs' counsel be appointed as Class counsel for the Class;

B.     That the unlawful conduct alleged herein be adjudged and decreed to violate § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

C.     That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint under §16 of the Clayton Antitrust Act, 15 U.S.C. §26;

D.     That the Court award Plaintiffs and the Class damages against Defendants for their violation of federal antitrust laws, in an amount to be trebled under § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, plus interest;

E.     That the unlawful conduct alleged here in be adjudged and decreed to be an unlawful enterprise in violation of RICO;

F.     For a judgment awarding Plaintiffs and the Class damages against Defendants for their violation of RICO, in an amount to be trebled in accordance with such laws;

G.     That the Court award Plaintiffs and the Class damages against Defendants for their violations of the Commodity Exchange Act;

H.     That the Court order Defendants to disgorge their ill-gotten gains from which a constructive trust be established for restitution to Plaintiffs and members of the Class;

I.     That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

J.     That the Court award Plaintiffs and the Class prejudgment interest at the maximum rate allowable by law; and

K.     That the Court direct such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs

demand a jury trial as to all issues triable by a jury.

Dated:  January 21, 2016                 Respectfully submitted,

 /s/ Geoffrey M. Horn        
Geoffrey M. Horn
Vincent Briganti
Peter St. Philip
Sitso W. Bediako
Raymond Girnys
Christian P. Levis
Michelle E. Conston
LOWEY DANNENBERG COHEN & HART,
P.C.
One North Broadway
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
Email: ghorn@lowey.com
      vbriganti@lowey.com
      pstphilip@lowey.com
      sbediako@lowey.com
      rgirnys@lowey.com
      clevis@lowey.com
      mconston@lowey.com

/s/Christopher Lovell        
Christopher Lovell
Victor E. Stewart
Benjamin M. Jaccarino
LOVELL STEWART HALEBIAN
JACOBSON LLP

116

61 Broadway, Suite 501
New York, NY 10006
Tel: (212) 608-1900
Fax: (212) 719-4677
Email: clovell@lshllp.com
        vestewart@lshllp.com
        bjaccarino@lshllp.com